# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | Case No. 4:21-cr-00588 |
| | § | |
| BRIAN BUSBY, | § | |
| | § | |
| | § | |

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL
UNDER RULES 29 AND 33**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ iii

LEGAL STANDARD ................................................................................... 2

ARGUMENT .................................................................................................. 3

    A.    The Court should vacate Mr. Busby's bribery convictions on Counts 8–13. ......... 3

        1.    The government repeatedly misstated the law and elicited witness testimony that contradicted the Supreme Court's ruling in *Snyder*. ........... 3

            i.    The government improperly stated that its cooperating witnesses were represented by good lawyers and that the Court found them guilty. .................. 12

            ii.    The government improperly stated that the cooperating witnesses "agreed to go to prison." ............... 13

            iii.    The government improperly bolstered its own witnesses and shifted the burden to defendants. ............... 14

            iv.    The government misstated the law concerning the required agreement to accept payment in exchange for an official act. ............................................... 15

            v.    The government's improper remarks affected Mr. Busby's substantial rights. ................................. 19

        2.    The Jury Instructions and Verdict Form regarding § 666 were improper. ..................................................................... 24

        3.    The Verdict Form constructively amended the Superseding Indictment. ..................................................................... 31

        4.    The government failed to present evidence that Mr. Busby agreed to take an official act in exchange for a payment. ..................................... 33

            i.    Counts 8 and 9—Southwest Wholesale ........................... 36

            ii.    Counts 11 and 13—Just Construction.............................. 36

            iii.    Counts 10 and 12—Southwest Wholesale and Just Construction .............................................................. 37

        5.    Government Exhibit 1 contained testimonial statements that violated Mr. Busby's rights under the Confrontation Clause of the Sixth Amendment. ..................................................................... 39

    B.    The Court should vacate Mr. Busby's conspiracy conviction on Count 1. .......... 51

    C.    The Court should vacate Mr. Busby's witness tampering conviction (Count 26). ..................................................................... 53

1.   The government was required to prove the facts alleged to violate 18 U.S.C. § 1512(b)(3). .......................................................... 53

2.   The government presented no evidence that Mr. Busby made the statements alleged in Count 26. ........................................... 54

3.   The evidence was insufficient for any reasonable jury to conclude that Mr. Busby acted "corruptly." ............................................. 58

4.   The government's closing argument constructively amended the Superseding Indictment and misstated the evidence. ............... 59

D.   The Court should vacate Mr. Busby's tax fraud convictions (Counts 29–33). ........................................................................................ 60

1.   The government failed to establish an accurate opening balance. ........... 61

2.   The government failed to trace cash deposits. ........................... 67

3.   The government failed to present any evidence that the cash deposits were taxable income. ................................................ 68

E.   The Superseding Indictment should be dismissed because the government knowingly presented false, material information to the Grand Jury .................... 69

1.   An FBI Special Agent testified that GEX 1 is a bribe ledger. ................. 69

2.   The agent told the grand jury that several witnesses confirmed that GEX 1 was an accurate bribe ledger when they did not. ........................ 71

3.   The government's presentation of false information to the grand jury influenced the grand jury and significantly prejudiced Mr. Busby. ........................................................................................ 74

F.   The joint trial severely and unfairly prejudiced Mr. Busby. ................................ 77

1.   Mr. Hutchison's "significant gambling problem" was inflammatory and irrelevant. ...................................................... 79

2.   Evidence regarding the alleged wire fraud involving Kiddie Cushion and grass cutting should not have been presented at Mr. Busby's trial. ........................................................................... 80

3.   The strip club evidence was highly inflammatory and completely irrelevant. ........................................................................... 82

4.   Mr. Hutchison introduced other inflammatory and irrelevant evidence into the trial of Mr. Busby. ...................................... 83

CONCLUSION ...................................................................................................83

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)................................................................................77

*Chapman v. California*,
    386 U.S. 18 (1967)..................................................................................48

*Fahy v. Connecticut*,
    375 U.S. 85 (1963)..................................................................................49

*Holland v. United States*,
    348 U.S. 121 (1954)................................................................................62

*McDonnell v. United States*,
    579 U.S. 550 (2016)................................................................25, 27, 34, 38

*Melendez-Diaz v. Massachusetts*,
    557 U.S. 305 (2009)..........................................................................47, 48

*Skilling v. United States*,
    561 U.S. 358 (2010)............................................................................2, 53

*Smith v. United States*,
    348 U.S. 147 (1954)................................................................................62

*Snyder v. United States*,
    603 U.S. 1 (2024)............................................................................ *passim*

*United Sates v. McCann*,
    613 F.3d 486 (5th Cir. 2010) ...............................................................14, 15

*United States v. Adams*,
    314 F. App'x 633 (5th Cir. 2009) (per curiam) (unpublished) ........................61, 62

*United States v. Adams*,
    760 F. Supp. 3d 6 (S.D.N.Y. 2024)..............................................26, 65, 66

*United States v. Adams*,
    778 F.2d 1117 (5th Cir. 1985) ............................................................31, 53

*United States v. Akpan*,
    407 F.3d 360 (5th Cir. 2005) ....................................................................49

*United States v. Alaniz,*
   726 F.3d 586 (5th Cir. 2013) ....................................................................4

*United States v. Alvarado-Valdez,*
   521 F.3d 337 (5th Cir. 2008) ..................................................48, 49, 50, 51

*United States v. Arce,*
   997 F.2d 1123 (5th Cir. 1993) .....................................................41, 42, 43

*United States v. Bennett,*
   874 F.3d 236 (5th Cir. 2017) ........................................................15, 19, 23

*United States v. Boulet,*
   577 F.2d 1165 (5th Cir. 1978) ............................................................ *passim*

*United States v. Bowen,*
   818 F.3d 179 (5th Cir. 2016) ........................................................12, 14, 15

*United States v. Bush,*
   451 F. App'x 445 (5th Cir. 2011) (per curiam) (unpublished) ..................4

*United States v. Calderon,*
   348 U.S. 160 (1954)................................................................................62

*United States v. Chambers,*
   408 F.3d 237 (5th Cir. 2005) ............................................................31, 53

*United States v. Clemons,*
   700 F. App'x 341 (5th Cir. 2017) ............................................................2

*United States v. Cortinas,*
   142 F.3d 242 (5th Cir. 1998) ............................................................78, 79

*United States v. Doucet,*
   994 F.2d 169 (5th Cir. 1993) ............................................................32, 53

*United States v. Duron-Caldera,*
   737 F.3d 988 (5th Cir. 2013) ..................................................................48

*United States v. Ebron,*
   683 F.3d 105 (5th Cir. 2012) ..................................................................43

*United States v. Fischer,*
   531 F.2d 783 (5th Cir. 1976) ..................................................................21

*United States v. Flores,*
   No. 22-50910, 2025 WL 561417 (5th Cir. Feb. 20, 2025), cert. denied, No.
   24-7297, 2025 WL 1787801 (U.S. June 30, 2025)................................32

*United States v. Frank,*
　　245 F.2d 284 (3d Cir. 1957) ........................................................................61

*United States v. Grace,*
　　No. 10-00143, 2019 WL 4126505 (M.D. La. Aug. 28, 2019) .................................34

*United States v. Gracia,*
　　522 F.3d 597 (5th Cir. 2008) ...............................................................12, 14

*United States v. Greenlaw,*
　　76 F.4th 304 (5th Cir. 2023) .................................................................4, 23

*United States v. Griffin,*
　　324 F.3d 330 (5th Cir. 2003) .....................................................................64

*United States v. Hamilton,*
　　46 F.4th 389 (5th Cir. 2022) .........................................................3, 8, 9, 13

*United States v. Holmes,*
　　406 F.3d 337 (5th Cir. 2005) .....................................................................40

*United States v. Jackson,*
　　636 F.3d 687 (5th Cir. 2011) ............................................................ *passim*

*United States v. Kay,*
　　359 F.3d 738 (5th Cir. 2004) ...............................................................27, 33

*United States v. Kizzee,*
　　877 F.3d 650 (5th Cir. 2017) .....................................................................50

*United States v. Lance,*
　　853 F.2d 1177 (5th Cir. 1988) ...................................................................21

*United States v. Levine,*
　　80 F.3d 129 (5th Cir. 1996) ......................................................................22

*United States v. Mares,*
　　402 F.3d 511 (5th Cir. 2005) ......................................................................4

*United States v. Marionneaux,*
　　514 F.2d 1244 (5th Cir. 1975) ...............................................................77, 78

*United States v. Marshall,*
　　557 F.2d 527 (5th Cir. 1977) ...............................................61, 65, 66, 68

*United States v. McRae,*
　　702 F.3d 806 (5th Cir. 2012) .....................................................................78

*United States v. Merida*,
   765 F.2d 1205 (5th Cir. 1985) ........................................................................77, 78

*United States v. Nelson*,
   No. 10-00099-BAJ-SCR-1, 2019 WL 1560437 (M.D. La. Apr. 10, 2019)............................34

*United States v. Nunez*,
   180 F.3d 227 (5th Cir. 1999) ........................................................................32, 53

*United States v. Okoroji*,
   No. 3:15-CR-00559-O, 2018 WL 8756434 (N.D. Tex. June 12, 2018) ................................64

*United States v. Pittman*,
   401 F. App'x 895 (5th Cir. 2010) ...................................................................10, 11

*United States v. Reasor*,
   418 F.3d 466 (5th Cir. 2005) ....................................................................31, 53, 60

*United States v. Rothenberg*,
   328 F. App'x 897 (5th Cir. 2009) ........................................................................63

*United States v. Salinas*,
   601 F.2d 1279 (5th Cir. 1979) ....................................................................31, 53

*United States v. Salinas*,
   654 F.2d 319 (5th Cir. 1981) ......................................................................32, 53

*United States v. Singh*,
   261 F.3d 530 (5th Cir. 2001) ...........................................................................78

*United States v. Smith*,
   814 F.3d 268 (5th Cir. 2016) .......................................................................12, 62

*United States v. USPlabs, LLC*,
   No. 3:15-CR-496-L, 2018 WL 5831478 (N.D. Tex. Nov. 7, 2018) .......................................78

*United States v. Wall*,
   389 F.3d 457 (5th Cir. 2004) ............................................................................2

*United States v. Wilson*,
   143 F.4th 647 (5th Cir. 2025) ..........................................................................12

*United States v. Yi*,
   460 F.3d 623 (5th Cir. 2006) ...........................................................................58

*United States v. Young*,
   470 U.S. 1 (1985)....................................................................................21, 43

*United States v. Young*,
    753 F.3d 757 (8th Cir. 2014) ........................................................43

*Vloutis v. United States*,
    219 F.2d 782 (5th Cir. 1955) .................................................62, 66

**Statutes**

18 U.S.C. § 666 .......................................................................... *passim*

18 U.S.C. § 1512(b)(3) ..................................................................53

26 U.S.C. § 7206 ...........................................................................63

**Constitutional Provisions.**

U.S. CONST. AMEND. XV ...............................................................22

U.S. CONST. AMEND. XVI ............................................22, 39, 40, 47

**Other Authorities**

FED. R. CIV. P. 12(b)(3) ..................................................................77

FED. R. CIV. P. 14 ...........................................................................77

FED. R. CRIM. P. 7(c)(1) ..................................................................52

FED. R. CRIM. P. 8 ...........................................................................77

FED. R. CRIM. P. 12(c)(3) .................................................................77

FED. R. CRIM. P. 29(a) .......................................................................2

FED. R. CRIM. P. 33(a) .......................................................................2

FED. R. EVID. 801(d)(2)(E) ........................................................41, 43

FED. R. EVID. 803(6) ......................................................................41

FED. R. EVID. 901 ....................................................................40, 44

*Bilk*, American Heritage Dictionary of the English Language, *available at*
    https://ahdictionary.com/word/search.html?q=bilk ..........................81

*Business*, MERRIAM-WEBSTER (last accessed Sept. 16, 2025), available at
    https://www.merriam-webster.com/dictionary/business.......................26

Internal Revenue Service, *Form 709, United States Gift (and Generation-Skipping Transfer)* https://www.irs.gov/pub/irs-pdf/f709.pdf ................................................ 68

*Mere*, THE AMERICAN HERITAGE DICTIONARY (last accessed Sept. 16, 2025) *available at* https://www.ahdictionary.com/word/search.html?q=mere ................................. 28

*Mere*, CAMBRIDGE DICTIONARY (last accessed Sept. 16, 2025), *available at* https://dictionary.cambridge.org/us/dictionary/english/mere .................................. 28

Mike Ogg, *What do Mortgage Lenders Look At?*, Rock Mortgage – Houston, available at https://www.rockmtg.com/blog/what-do-mortgage-lenders-look-at/#:~:text=Although%20assets%20don%27t%20weigh,other%20investments %20you%27ve%20made .......................................................................................... 64

*Namely*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (last accessed Sept. 16, 2025), available at https://www.ahdictionary.com/word/search.html?q=namely ................................... 24

*Namely*, MERRIAM-WEBSTER (last accessed Sept. 16, 2025), available at https://www.merriam-webster.com/dictionary/namely; ......................................... 24

*Transaction*, MERRIAM-WEBSTER (last accessed Sept. 16, 2025), available at https://www.merriam-webster.com/dictionary/transaction ...................................... 27

The jury convicted Mr. Busby of 13 counts after a four-week trial permeated by misleading testimony and improper government argument and based on a legal theory that the Supreme Court has rejected. Each of these issues is independently sufficient to warrant acquittal or a new trial. But, together, the cumulative effect is inescapable: the jury's verdict was based on pronounced and persistent error. The list of errors is long, and the magnitude of those errors is significant:

1.    The government repeatedly misstated the law and elicited witness testimony that contradicted the Supreme Court's ruling in *Snyder*;

2.    The Jury Instructions failed to correct the government's persistent misstatement of the law, and the Verdict Form invited the jury to convict based on the government's incorrect legal theory;

3.    The Verdict Form constructively amended the Superseding Indictment;

4.    The government failed to allege or introduce any evidence that Mr. Busby accepted a payment before taking an official act or agreed beforehand to take an official act in exchange for a later payment;

5.    The government's case hinged on Government Exhibit 1, which the government failed to authenticate and which the government's own witnesses unanimously testified did not list bribes;

6.    The jury was improperly instructed regarding Count 1 (Conspiracy);

7.    The government failed to present any evidence that Mr. Busby made the statements alleged in Count 26 (Witness Tampering);

8.    The government failed to present sufficient evidence to prove Counts 29–33 (Wilfully Filing False Tax Returns);

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 1**

9.    The government obtained the Superseding Indictment by knowingly presenting false, material information to the Grand Jury; and

10.    The joint trial of Mr. Busby and Mr. Hutchison severely and unfairly prejudiced Mr. Busby because the government and Mr. Hutchison elicited inflammatory and prejudicial testimony that should have been excluded.

Because of these serious and compounding issues, Mr. Busby's conviction should be vacated, and the Court should either enter an order of acquittal or grant Mr. Busby a new trial.

## LEGAL STANDARD

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a).

When a conviction is predicated on a flawed legal theory, it must be vacated. *See e.g.*, *Skilling v. United States*, 561 U.S. 358, 413 (2010) (holding that a defendant's conviction under § 1346 had to be vacated because the government did not allege a valid honest services fraud theory).

"A verdict 'may not rest on mere suspicion, speculation, or conjecture, or an overly attenuated piling of inference on inference.'" *United States v. Clemons*, 700 F. App'x 341, 344 (5th Cir. 2017) (citation omitted).

Further, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). A new trial is warranted when "a miscarriage of justice" has occurred. *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004).

## ARGUMENT

### A.  The Court should vacate Mr. Busby's bribery convictions on Counts 8–13.

Mr. Busby's bribery convictions under 18 U.S.C. § 666 (Counts 8–13) should be vacated for at least six reasons: (1) the government tried a gratuity case despite the Supreme Court's decision in *Snyder*, which holds that § 666 does not criminalize gratuities; (2) the jury instructions were improper in several regards; (3) the Verdict Form constructively amended the Superseding Indictment; (4) the government failed to allege or introduce evidence that Mr. Busby accepted or agreed to accept a payment before taking an official act; (5) the admission of Government Exhibit 1 ("GEX 1") violated Mr. Busby's Confrontation Clause rights; and (6) the government presented the jury with false, material testimony concerning payment amounts.

### 1.  The government repeatedly misstated the law and elicited witness testimony that contradicted the Supreme Court's ruling in *Snyder*.

The government investigated, indicted, and tried a *gratuity* case under 18 U.S.C. § 666, ignoring the Supreme Court's decision in *Snyder v. United States*, 603 U.S. 1, 5 (2024). The government's cooperating witnesses all pled guilty in 2021 to conspiracy to commit "bribery" in violation of § 666 based on the acceptance of gratuities. On April 7, 2022, the grand jury returned the Superseding Indictment alleging violations of § 666—again, based on acceptance of gratuities. But four months later, on August 23, 2022, the Fifth Circuit held that § 666 does not criminalize gratuities. *See United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022). And in 2024, the Supreme Court held that accepting gratuities does not violate 18 U.S.C. § 666. *See Snyder*, 603 U.S. at 5.

Instead of reassessing its prosecution following *Snyder*, the government persisted with its original, now-invalidated gratuity theory against Mr. Busby. At trial, the government made no attempt to prove the elements of *quid-pro-quo* bribery—as *Snyder* requires—opting instead to blur

the distinction between a legal gratuity and an illegal bribe before the jury. The government did this by: (1) eliciting improper, self-contradicting testimony from cooperating witnesses; and (2) misstating the law in its closing argument. The government's incorrect legal theory infected the entire trial.

The government's repeated misstatements of the law and solicitation of improper testimony constitute reversible error. A verdict must be set aside where a prosecutor makes an improper remark, such as an incorrect statement of the law, or engages in improper questioning that affects "the substantial rights of the defendant." *United States v. Greenlaw*, 76 F.4th 304, 338 (5th Cir. 2023). To determine if a remark prejudiced a defendant's substantial rights, the Court assesses "the magnitude of the statement's prejudice, the effect of any cautionary instructions given, and the strength of the evidence of the defendant's guilt." *Id.* "[I]mproper comment or questioning" results in reversible error when the remark or questioning was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." *Id.* at 338–39 (citing *United States v. Alaniz*, 726 F.3d 586, 616 (5th Cir. 2013) (quotation omitted)). "Additionally, [a] prosecutor's closing remarks are reversible error when they 'cast serious doubt on the correctness of the jury's verdict.'" *Id.* (quoting *United States v. Bush*, 451 F. App'x 445, 451 (5th Cir. 2011) (per curiam) (unpublished) (quoting *United States v. Mares*, 402 F.3d 511, 515 (5th Cir. 2005)).

Here, the government's misstatement of bribery law was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial" and "cast doubt on the correctness of the jury's verdict." *See id.* Through the testimony of five cooperating witnesses and the government's closing arguments, the government sought to convince the jury that a school employee who accepts a gift from a school contractor committed bribery, even if he never agreed or intended to do anything in exchange for the gift. *Cf. Snyder*, 603 U.S. at 19.

### a. The government elicited testimony that erased the distinction between a legal gratuity and an illegal bribe.

The government's cooperating witnesses—the so-called "heart" of the government's case—testified that the payments they received from Mr. Hutchison were "gifts" and that they never agreed with Mr. Hutchison to do anything in exchange for payment. Yet these same cooperators also testified that they pled guilty to "bribery" and "conspiracy to commit bribery." The government elicited this testimony from all its cooperating witnesses: Alfred Hoskins, Derrick Sanders, Gerron Hall, Luis Tovar, and Rhonda Skillern-Jones.

Alfred Hoskins' testimony exemplifies how the government sought to avoid its burden by confusing the jury about the law. On cross examination, Mr. Hoskins testified that the money he received from Mr. Hutchison was a "gift." *See* Day 5 am Tr. at 119:21–24 ("Q. You understand the word 'gratuity'? Gift? A: Yes. Yes. Q. This was a gift, right? That's what you thought it was? A. Yes, sir. Yes, sir."). Mr. Hoskins' testimony was consistent and forceful on this point. *See, e.g.*, *Id.* at 18:12–19:4; 23:7–15; 33:16–34:8; 57:22–58:19; 66:21–68:16; 84:14–85:12. He repeatedly told the jury that he never agreed or intended to do anything in exchange for any payment from Mr. Hutchison. *Id.* He testified that when the government first interviewed him, he argued with the FBI agent about whether accepting money from Mr. Hutchison was a crime. *Id.* at 32:16–35:16. Mr. Hoskins explained that he did not think it was a crime to accept the money because the money was not "*for*" anything. *Id.* at 32:21–34:16 (emphasis added). He testified that Mr. Hutchison unexpectedly gave him money and said, "Thank you," "I appreciate you," and "[T]his is for such-and-such [school]." *Id.* at 36:3–5; 56:10–57:21; 68:15–16. Mr. Hoskins explained to the jury that the FBI agent told him, "If I took money from Mr. Hutchison from a -- from a job, from him -- a favor, I was taking a bribe." *Id.* at 34:13–34:16. And Mr. Hoskins testified that he

disagreed with the FBI agent about the law, and even though Mr. Hoskins was "confused," he felt like he was in trouble and agreed to plead guilty and cooperate. *Id.* at 35:6–16.

As Mr. Hoskins' testimony illustrates, rather than properly advise the jury that gratuities do not violate § 666, the government instead sought to convince the jury that Mr. Hoskins committed "bribery" when he accepted a "gift, a gratuity," from Mr. Hutchison. *Id.* at 119:21–24

After Mr. Hoskins repeatedly testified that he only received gifts and never had any agreement with Mr. Hutchison to do anything in exchange for a payment, the government asked Mr. Hoskins a series of questions on redirect designed to convince the jury that *the Court* independently found Mr. Hoskins guilty of conspiracy to commit bribery:

> Q. And then, eventually, **you hired a lawyer**?
> A. Yes, sir.
> Q. Okay. And then you decided to plead guilty?
> A. Yes, sir.
> Q. Did you enter a guilty plea in private with just the government, or did you have to come to **the courtroom**?
> A. **The courtroom.**
> Q. Okay. And did you enter a formal written plea agreement?
> A. Yes, sir.
> Q. Was the -- **was the judge here when you pled guilty**?
> A. Yes, sir.
> Q. And what was the crime you pled guilty to?
> A. **Bribery** and --
> Q. Well, let me --
> A. -- conspiracy --
> Q. Let me show you your plea agreement. Does this say you pled guilty to Count 1 of the criminal information and that Count 1 charges you with conspiracy in violation of Section 371?
> A. Yes, sir.
> Q. Did you understand that it was conspiracy to commit **bribery?**
> A. Yes, sir.
> Q. And then, as part of that plea hearing, did the government read into the record, **in front of the judge**, the facts that supported the plea?
> A. Yes, sir.
> Q. And had you discussed the facts ahead of time **with your attorney**? And I don't want you to tell us what your attorney told you, but had --
> A. Yeah.
> Q. -- had you discussed the facts **with your attorney**?

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 6**

A. Yes, sir.

Q. And do you see, at page 7 of the plea agreement, that -- where it says, "Factual Basis for the Guilty Plea"? Do you see that?

A. Yes, sir.

Q. Okay. And then, if we go to the next page, is there some single-spaced **written discussion of the evidence**?

A. Yes, sir.

Q. Okay. And **is that what was read into the record while** you were standing here in the courtroom and **the judge was sitting there on the bench?**

A. Yes, sir.

Q. And you -- did you swear under oath that those facts were true?

A. Yes, sir.

Q. Were they true?

A. Yes, sir.

Q. And then, if we go to the end of the plea agreement, did you sign the agreement?

A. Yes, sir.

Q. What's the date?

A. October 26, 2021.

Q. Okay. Is that the day that **you stood here before the Court** and said that you were guilty?

A. Yes, sir.

Q. And then is it also **signed by your attorney**?

A. Yes, sir.

Q. Do you believe that you are, in fact, guilty of the crime of conspiracy to commit **bribery**?

A. Yes, sir.

Q. And do you understand that **the Court** had to accept your guilty plea?

A. Yes, sir.

Q. **Do you think the Court would have accepted your guilty plea if you weren't, in fact, guilty?**

A. **No, sir.**

*Id.* at 90:14–93:5 (emphasis added).

This line of questioning was misleading and confusing. Based on this questioning, the jury was told that a "written discussion of the evidence" against Mr. Hoskins as part of a bribery scheme was presented to "the judge [who] was sitting on the bench." *Id.* Then, after the Court heard the evidence, it was afforded the opportunity to decide if, based on that evidence and Mr. Hoskins' statement that he was guilty, Mr. Hoskins was actually guilty. The government accordingly led the jury to believe that after hearing the facts, *the Court* independently found Mr. Hoskins—who had

just told the jury that he only received gifts—guilty of conspiracy to commit bribery in violation of § 666.

This line of questioning was significantly misleading because: (1) the factual basis of the Plea Agreement made no mention of gifts or gratuities—which Mr. Hoskins testified was what he received—and included facts that Mr. Hoskins explicitly contradicted on the stand; and (2) at the time Mr. Hoskins pled guilty in 2021, neither the Fifth Circuit nor the Supreme Court had held yet that accepting a gratuity does *not* violate § 666.

*First*, the Factual Basis that was read at Mr. Hoskins' plea hearing, made no reference whatsoever to gifts and instead, summarily proclaimed that Mr. Hutchison paid Mr. Hoskins "bribes" without including a single fact to support that Mr. Hoskins agreed or intended to do anything in exchange for a payment from Mr. Hutchison. The government referenced the Factual Basis but did not read it to the jury, so the jury did not know that Mr. Hoskins' trial testimony contradicted the facts listed in his guilty plea. Mr. Hoskins' plea agreement states in relevant part:

> Hutchison **paid cash bribes** to HOSKINS who helped award, or refrained from interfering in the award of, HISD jobs to Hutchison. Hutchison **paid bribes** to HOSKINS from approximately 2017 to 2019. According to Hutchison's **bribe ledger** recovered by the Federal Bureau of Investigation during a search of Hutchison's residence, Hutchison paid HOSKINS a total of approximately $106,000 in **bribes** in 2017. For example, on or about October 25, 2017, Hutchison paid HOSKINS an approximate **$25,000 bribe** related to projects at Fonwood Elementary School that were valued at over $900,000.

Busby Ex. 2 at 8. Stated differently, the Plea Agreement contained no facts to establish that any payment was a bribe rather than a gratuity. Ignoring this reality, the government leveraged this pre-*Hamilton* plea agreement to lead the jury to believe that the Court found Mr. Hoskins guilty based on the facts Mr. Hoskins testified to at trial. *Cf. Hamilton*, 46 F.4th at 394; *Snyder*, 603 U.S. at 5. But this was not so.

*Second*, the government's line of questioning was misleading and confusing because the Court accepted Mr. Hoskins' guilty plea on October 26, 2021, nearly *a year before* the Fifth Circuit held that gratuities do not violate § 666 and while the circuit courts that had addressed the question were split. *Compare* Busby Ex. 2 (signed Oct. 26, 2021), *with Hamilton*, 46 F.4th at 394 (decided Aug. 23, 2022), *and Snyder*, 603 U.S. at 10 (decided June 26, 2024).

The government took this same approach with all its cooperating witnesses, repeatedly eliciting testimony that led the jury to believe that *the Court* found all its cooperating witnesses guilty of conspiracy to commit bribery because they accepted gifts or gratuities from Mr. Hutchison—despite the fact that none of them agreed or intended to do anything in exchange for a payment.

- *Compare* Day 4 pm Tr. at 66:11–67:12 (Luis Tovar testifying he never agreed to do anything for payment), *with id.* at 93:1–11 (Luis Tovar testifying he is guilty);

- *Compare id.* at 59:12–60:20 (Gerron Hall testifying he never agreed to do anything for payment), *with id.* at 100:13–101:2 (Gerron Hall testifying he pled guilty);

- *Compare* Day 2 pm Tr. at 139:2–25; 159:5–160:7 (Derrick Sanders testifying he never agreed to do anything for any payment), *with id.* at 71:1–22 (Derrick Sanders testifying he pled guilty to conspiracy to commit bribery);

- *Compare* Day 5 pm Tr. at 117:2–21 (Rhonda Skillern-Jones testifying she never had an agreement with Mr. Hutchison), *with id.* at 55:19–57:4 (Rhonda Skillern-Jones testifying she is guilty of bribery).

And the government even sought to reiterate this point while cross-examining Mr. Busby: "I mean, do you think it's odd that someone would plead guilty to bribery charges for accepting a donation for Hurricane Harvey victims?" Day 16 am Tr. at 69:11–13. This questioning and testimony corrupted the entire trial and cast doubt on the correctness of the jury's verdict.

>    b.  **The government improperly questioned Mr. Busby regarding other witnesses' testimony.**

On cross-examination of Mr. Busby, the government repeatedly recited the testimony of its cooperating witnesses and then improperly asked Mr. Busby to opine on whether that testimony was true. The Fifth Circuit "has repeatedly held that a prosecutor's questioning a defendant[] about the veracity of the government's witnesses is 'inappropriate.'" *United States v. Pittman*, 401 F. App'x 895, 898 (5th Cir. 2010). Despite the clear prohibition of this line of questioning, the government repeatedly asked Mr. Busby to testify regarding the veracity of its cooperating witnesses' testimony. *See, e.g.*,

- Day 15 pm Tr. at 85:20–25 ("Do you remember [Mr. Sanders'] testimony? . . . And do you have any reason to dispute that testimony?");

- *id.* at 87:14–15 ("Do you agree with [Mr. Sanders'] testimony or do you think it's incorrect?");

- *id.* at 151:5–7 ("So if Mr. Salazar testified that the disagreement between you and him was related to the award of this 12-8-03 contract, that would be incorrect is what you're saying?"):

- *id.* at 156:17 ("So what's your position about [Mr. Sanders'] testimony?");

- *id.* at 157:12–13 ("And is that—do you agree with [Mr. Hoskins'] testimony?");

- *id.* at 158:10–13 ("Do you remember [Mr. Hoskins] testifying to that effect?" . . . "And are you saying that that testimony is incorrect?");

- *id.* at 158:20–22 ("Do you remember [Mr. Hoskins'] testimony?" . . . "And is that accurate?");

- Day 16 am Tr. at 61:21–62:4 ("Do you remember [Ms. Skillern-Jones] testifying that she had leftover bond money . . ." "Your saying that . . . testimony is incorrect?");

- *id.* at 62:7–10 ("Do you remember [Ms. Skillern-Jones] testifying to that? . . . "Is that correct or incorrect?");

- *id.* at 63:1–2 ("So if [Ms. Skillern-Jones] testified to that, that's incorrect?");

- *id.* at 63:16–18 ("Do you remember [Ms. Skillern-Jones] testifying to that?" . . . "And is that incorrect?");

- *id.* at 63:20–21 ("[Ms. Skillern-Jones] said that you told her it was for the projects that had been performed. Is that incorrect?");

- *id.* at 66:7–8 ("And so when [Ms. Skillern-Jones] said that you told her that, 'Hutch can do it for us,' that's incorrect?");

- *id.* at 66:10–11 ("And then [Ms. Skillern-Jones] also testified that you told her that, 'We can get something from it.' Is that incorrect?");

- *id.* at 66:17 ("And did that payment occur the way [Ms. Skillern-Jones] said?"); and

- *id.* at 67:2–3 ("And my question is: Is [Ms. Skillern-Jones'] testimony accurate or inaccurate?").

The government asked these questions throughout Mr. Busby's cross-examination, which stretched over two days. And the government persisted in these improper questions despite the Court sustaining counsel's objections. The government's inappropriate and persistent questioning of Mr. Busby constituted error and substantially affected Mr. Busby's rights. *See Pittman*, 401 F. App'x at 898.

### c. The government's closing argument was improper because it misstated the law and improperly vouched for cooperating witnesses.

The government not only used its cooperators to confuse the jury about the law, but it doubled down on its strategy to confuse the jury about the law by emphasizing in its closing argument that all its cooperating witnesses—who all testified that they never agreed with Mr. Hutchison to do anything in exchange for payments—pled guilty to conspiracy to commit bribery. Indeed, the government boldly stated that the cooperating witnesses: (1) were "represented by good lawyers"; (2) were found guilty by the Court; and (3) "agreed to go to prison." There can be no doubt that these improper representations, individually and collectively, impacted the jury's determination because the cooperating witnesses were the "heart" of the government's case. *See*

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 11**

*United States v. Gracia*, 522 F.3d 597 (5th Cir. 2008) ("The prosector's plainly erroneous statements led the jury to substitute the government's credibility assessment of its own [witnesses] for the jurors' independent credibility call[.]").

      i.   **The government improperly stated that its cooperating witnesses were represented by good lawyers and that the Court found them guilty.**

The government improperly told the jury in closing argument that the cooperating witnesses were represented by good lawyers and that the Court found them all guilty after questioning them.

> So there's really one, I would say, central fact in this case. And that is that **five people have pled guilty already to being participants in this scheme. They've pled guilty to conspiracy**. **And I can tell you**, and you should realize from the application of your own common sense, that **no one volunteers to go to federal prison.** They don't -- people do not plead guilty on a whim. **They don't plead guilty because they think it's somehow going to benefit them.** People plead guilty because they truly believe they did something wrong, and **they are guilty**.
>
> All of these people who pled guilty, all five of them, were **represented by good lawyers**. They pled guilty **in front of this judge, and they're questioned by the Court when they plead. And it's a very careful process. And the judge finds them guilty at the end of that process. They're guilty.**

Day 19 pm Tr. at 136:13–137:3 (emphasis added). Like the government's direct of Mr. Hoskins where it elicited testimony that the Court would not find Mr. Hoskins guilty if he was not in fact guilty, the government's closing argument was both improper vouching and misleading. *See, e.g.*, *United States v. Wilson*, 143 F.4th 647, 664 (5th Cir. 2025) ("It is improper for prosecutors to vouch for the credibility of witnesses or express personal opinions concerning the guilt of the accused."); *United States v. Smith*, 814 F.3d 268, 275 (5th Cir. 2016) (warning against the government using its power to imply that it "knows that the accused is guilty or has non-judicially reached conclusions on relevant facts with tend to show he is guilty"); *United States v. Bowen*, 818

F.3d 179, 191 (5th Cir. 2016) (concluding that the government's argument that its cooperating witnesses would be "called to task" for any dishonesty constituted improper vouching).

The government did not tell the jury: (1) that the facts presented to the Court at the plea hearings were substantially different than the facts the witnesses testified to at trial; nor (2) that at the time of the guilty pleas in 2021, the Fifth Circuit had not yet held that § 666 does not criminalize gratuities. *See Hamilton*, 46 F.4th at 394. Rather, the government led the jury to believe that the Court concluded that the law applied to the facts heard at trial constituted bribery, which was simply not true and significantly misleading.

### ii. The government improperly stated that the cooperating witnesses "agreed to go to prison."

Further vouching for the cooperating witnesses and misleading the jury, the government repeatedly stated in closing argument that the cooperating witnesses had "*agreed to go to prison*" because of Mr. Busby, and therefore, the jury should find Mr. Busby guilty. *See* Day 19 pm Tr. at 41:22–142:4:

> But the point is at the heart of this case is the witness testimony. Five people have **agreed to go to prison**, have pled guilty, and they've come here and told you what they believe happened and why they've pled guilty, why **they're going to prison**. And the reason they're **going to prison** has a whole lot to do with these two people. They're right in the middle of it. So we are asking you to find both defendants guilty.

*Id.* (emphasis added).

This simply was not true. None of the cooperating witnesses have agreed to go to prison. But the government's statement was designed to bolster the credibility of the cooperating witnesses and their guilty pleas. The government's comment was also highly inflammatory because it blamed Mr. Busby for the cooperators "going to prison." Moreover, the government's "going to prison" argument—like its general "these cooperators are guilty" argument—led the jury to "believe that there is other evidence, unknown or unavailable to the jury, on which the prosecutor was basing

his argument as to the witnesses' credibility." *Bowen*, 818 F.3d at 191 (quoting *United Sates v. McCann*, 613 F.3d 486, 495 (5th Cir. 2010)). This was improper and calls into question the correctness of the jury's verdict.

> ### iii. The government improperly bolstered its own witnesses and shifted the burden to defendants.

In its rebuttal closing argument, the government improperly vouched for its witnesses again and shifted the burden to Mr. Busby to call witnesses to disprove the government's charges. Specifically, in response to argument about the government's decision not to call Mr. Nabors to testify (despite the government promising to do so in its opening statement), the government stated:

> There's one issue I need to clear up on the front end . . . **the government is not allowed to call witnesses who we believe will perjure themselves. We're not allowed to do that, and we don't do that. And so we make our decisions of who to call with that in mind. So I'll just leave it at that.**
>
> The other point I would make is you saw from the witness list that was put up on the screen. **The defense obviously has the ability to call witnesses too. They've called a lot of witnesses in this case. They're free to call who they want.**

Day 19 pm Tr. at 135:23–136:12 (emphasis added).

This argument was improper and impermissible per se. "It is impermissible per se for a prosecutor to offer personal assurances to the jury that government witnesses are telling the truth[.]" *McCann*, 613 F.3d at 490. "The government may not cloak a witness in its 'protective mantle.'" *Gracia*, 522 F.3d at 601. But the government did just that: provided personal assurance to the jury that it would not call witnesses who perjure themselves—that is, the jury could trust the government's witnesses because the government trusted them. At the same time, the government implied that the defendants could and did call witnesses who perjured themselves. Under *McCann*, this argument was "impermissible per se." *See McCann*, 613 F.3d at 490.

Further, the government alluded to evidence not presented to the jury, invoked the prosecutors' personal status as the government's attorneys, and sought to shift the burden of presenting evidence to Mr. Busby—all tactics the Fifth Circuit has "time and again denounced." *See United States v. Bennett*, 874 F.3d 236, 254 (5th Cir. 2017) ("The prosecutor, by alluding to evidence not presented at trial [and] personally opining on the case and his witnesses "and denigrating the presumption of innocence, 'roam[ed] beyond the evidence presented at trial,' opting for the 'improper, even pernicious' route of invoking his 'personal status as the government's attorney' to serve as a basis for the conviction of [the defendant]—a route that we have time and again denounced.").

The government's statement made it clear "that the prosecutor was aware of facts not in evidence"—*i.e.*, the pretrial statements of government witnesses—"that convinced him that the [witnesses] were telling the truth." *Cf McCann*, 613 F.3d at 496. No evidence whatsoever was presented about any of Mr. Nabors' statements to the government, nor was "evidence before the jury" regarding the other witnesses' pretrial statements.[1] Similarly, there was no "evidence before the jury" about the quality of the witnesses' lawyers or any purported agreements from the witnesses "to go to prison." Yet the government referenced this extraneous information to vouch for its own witnesses. The prosecutor's arguments were improper and cast serious doubt on the correctness of the jury's verdict. *See Bennett*, 874 F.3d at 254; *Bowen*, 818 F.3d at 191.

### iv. The government misstated the law concerning the required agreement to accept payment in exchange for an official act.

Additionally, in its efforts to confuse the jury about the law, the government told the jury in its rebuttal closing argument that: (1) the only "agreement" needed to prove "bribery" is an

---

[1] While the government presumably met with its witnesses in preparation for trial, the government did not produce to defendants a single interview report for any meeting with a cooperating witness after August 2021.

agreement between two individuals on the same side of an alleged bribery transaction—Ms. Skillern-Jones and Mr. Busby; and (2) an agreement to give a vendor work is the only agreement needed to prove bribery. The government argued:

> But, really, the two most important of the cooperating defendants are Derrick Sanders and Rhonda Skillern-Jones because **they're the ones where the agreement that Mr. Hardin was just speaking about, the key agreement to commit bribery, is the most clear.**

Day 19 pm Tr. at 8–12.

### (1) Rhonda Skillern-Jones

The government tried to convince the jury that bribery can be entirely one-sided. The government argued:

> So with Rhonda Skillern-Jones, **she reached an agreement with Brian Busby** that they were going to have Hutchison do this project, and they were going to get something from it. And then after they made that agreement, Busby delivered the money to her, and they got something from it. And so that — what happened there is exactly what Mr. Hardin just told you needs to happen. **The agreement happened -- the agreement preceded the bribery payment. That's the way it's supposed to work legally.**

*Id.* at 138:13–21 (emphasis added). The government's argument was a glaring misstatement of the law. *See Snyder*, 603 U.S. at 5 (holding that "bribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act") (emphasis in original)). The government attempted to convince the jury—contrary to the law—that bribery does not require any agreement between the person receiving the bribe and the person giving the bribe. Under the government's theory, bribery can be entirely one-sided,[2] and no agreement with the

---

[2] While it may be a crime for two individuals to agree to *solicit* a bribe, Mr. Busby and Ms. Skillern-Jones were charged only with *accepting* bribes. And there was no evidence at trial that any defendant (neither Mr. Busby nor any of the cooperating witnesses) ever solicited a bribe. Instead, the government's sole theory was that the defendants are guilty of bribery because they received money from Mr. Hutchison.

alleged bribe payor is necessary. But *Snyder* directly rejected this theory. Snyder made clear that the government must prove that there was an "agreement beforehand" between a bribe payer and a bribe receiver to sustain a conviction under 18 U.S.C. § 666. *See id.* at 18 ("In isolation, the word "rewarded" could be part of a gratuities statute or a bribery statute—either (i) a reward given after the act with no agreement beforehand (gratuity) or (ii) *a reward given after the act pursuant to an agreement beforehand (bribe)*.") (emphasis added).

### (2) Derrick Sanders

The government also led the jury astray by misstating the law and misrepresenting the evidence when arguing that Mr. Sanders had the necessary *agreement* with Mr. Hutchison.

> Same things with Mr. Sanders. For years he -- or not for years, but maybe for about a year, he pushed back on Mr. Busby. Busby was trying to recruit him into this scheme. He wanted Sanders to give work to Mr. Hutchison. He made suggestions about how Mr. Sanders could do that. He could, basically, end projects prematurely and cut out part of the project, take it away from the general contractor and give it to Mr. Hutchison.

> Sanders said, no, that's ridiculous. I can't do that. **And then finally Sanders agreed. And he went and had that lunch meeting with Mr. Hutchison, and they came to an agreement.** And then shortly thereafter, the money started coming his way, and Mr. Sanders did what he could (sic) steer work to Mr. Hutchison. **That's exactly what Mr. Hardin said needs to happen. There was an agreement, then the payments start, and then the steering of the work to Mr. Hutchison begins.**

> . . .

> And so Southwest Wholesale benefited; Mr. Sanders benefited. And that's the *quid pro quo*. The exchange.

> Same thing with Rhonda Skillern-Jones. She sent work to Mr. Hutchison, the bribe came to her. That's a *quid pro quo*. That's what the law requires. **So those are the most two (sic) clear instances of that agreement and the required exchange**.

Day 19 pm Tr. at 138:22–139:12; 140:1–8 (emphasis added).

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 17**

The Supreme Court flatly rejected this argument in *Snyder* because bribery requires that a local official either "accepts an up-front payment for a future official act or **agrees to a future reward for a future official act**." *Snyder*, 603 U.S. 19. "**But a state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given.**" *Id.* at 19 (emphasis added).

The problem for the government was that Mr. Sanders testified that he neither received an up-front payment nor did he "agree[] to a future reward for a future official act." Day 2 pm Tr. at 151:3–7 ("Q. So would you agree with me in that meeting that you don't remember when it was in 2017, nothing was said about an agreement to perform -- to get money -- give money to get a particular job? A. No, sir."). Mr. Sanders testified that there was no "reward given after the act *pursuant to an agreement beforehand (bribe)*." *But see Snyder*, 603 at 18. So, the government sought to convince the jury that the government need not prove that a defendant has an "agreement beforehand" to accept a "future reward for a future official act." The government told the jury that it only had to prove that a person *agreed* to give someone work and then later received a payment— precisely the theory *Snyder* rejected. *See id.* at 4 ("Congress made clear that the *timing of the agreement* is the key, not the timing of payment. Although a gratuity or reward offered and accepted by a state or local official after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate §666.") (emphasis added)).

The government improperly elicited inaccurate and highly prejudicial testimony that receiving a "gratuity" or "gift" constitutes bribery. It also significantly misstated both the law and the evidence in its closing arguments. The government's repeated and substantial misstatements of both the law and the evidence cast serious doubt on the correctness of the jury's verdict.

### v.    The government's improper remarks affected Mr. Busby's substantial rights.

The government's improper remarks affected Mr. Busby's substantial rights—that is, the "remarks cast serious doubt on the correctness of the jury's verdict." *Bennett*, 874 F.3d 254. Under *Bennett*'s three-factor test: (1) the magnitude of the prejudicial effect of the government's improper remarks was significant; (2) the Court provided only a very limited cautionary instruction regarding the improper burden-shifting remark and did not address at all the government's improper vouching or misstatements of the law; and (3) the evidence supporting conviction was extremely weak, at best. *Id.*

### 1.    The magnitude of the prejudicial effect was significant.

The magnitude of the prejudicial effect of the government's various remarks was significant.

*First*, the government's improper vouching to bolster the credibility of its five cooperating witnesses was highly prejudicial because the government's entire case rested on their testimony and GEX 1, which is addressed below in Section A(5). The cooperating witnesses' credibility was called into question because they all testified to facts that contradicted their plea agreements. *See, e.g.*, Day 5 am Tr. at 122:9–20 (Mr. Hoskins testifying that he never received the $25,000 payment his plea agreement states he received); Day 2 pm Tr. at 166:4–19.(Mr. Sanders testifying that he received approximately $60,000 to $70,000, not the $92,000 stated in his plea agreement and noting that "in my actual plea agreement, I think that number was changed[,]" and "In my plea agreement, I don't recall that number being there.").

To bolster and rehabilitate its witnesses' testimony, the government attempted to convince the jury in closing that its cooperators were guilty of bribery, and therefore, the jury should find Mr. Busby guilty of bribery as well. Specifically, the government told the jury that its cooperating

witnesses were all "represented by good lawyers"; the Court had found each of the cooperators guilty of bribery; and the cooperators all "agreed to go to prison." *See* Day 19 pm Tr. at 135:23–137:3; 141:22–142:4. There was no evidence before the jury to support these statements, which were made in closing rebuttal so that Mr. Busby had no chance to respond. *See id.* Because the government's case rested on the shoulders of these unreliable self-contradicting witnesses, the government's improper statements vouching for the truthfulness of its witnesses based on information not before the jury was highly prejudicial.

*Second*, the government's remark about perjury was highly prejudicial. While the comment was apparently prompted by Mr. Hutchison's arguments about Larry Nabors, the comment was not limited to Mr. Nabors. It applied to all the government's witnesses.

Mr. Nabors, the longtime HISD employee responsible for overseeing the grounds maintenance contracts, was a central figure in many of the events at issue in the trial. The government promised in its opening statement that it would call Mr. Nabors to testify that Mr. Hutchison lied about reporting billing issues to HISD. Day 2 am Tr. at 35:2–5 ("Mr. Nabors will come in and testify and say he doesn't remember a conversation like that, no one told him, and he would remember if someone told him that there was an 850,000-dollar billing error. He'll say he never heard that one."). But the government never called Mr. Nabors. In closing argument, Mr. Hutchison pointed out the government's unfulfilled promise, arguing that the government's decision not to call Nabors to testify should "concern" the jury. Day 19 pm Tr. at 93:25–95:11.

In closing rebuttal, the government explained to the jury that it did not call Mr. Nabors to testify because they thought he would perjure himself. *See id.* at 135:23–136:12. In the same breath, the government stated that the defendants "called a lot of witnesses" and are "free to call

who they want," implying that the defendants called witnesses who perjured themselves. *Id.* The government's statement was highly prejudicial.[3]

*And third*, the government routinely misstated the law as it attempted to convince the jury that, notwithstanding *Snyder*, accepting a gratuity constitutes bribery under § 666. The government further claimed that bribery does not require any agreement between the person receiving the bribe and the person giving the bribe. And, as discussed in Section A(4), the government neither alleged nor proved that Mr. Busby agreed to take any official act in exchange for an alleged payment—a fundamental element of the law.

When considering the prejudicial effect of the government's improper remarks, they must be taken in context. *See United States v. Young*, 470 U.S. 1, 12 (1985). In this case, the improper remarks were significant, pervasive, and individually and collectively highly prejudicial.

2. **The Court's cautionary instruction was limited and did not address the government's vouching or misstatements of the law.**

The government made improper statements in rebuttal closing argument. The next day, the Court gave the jury a cautionary instruction limited to the government's improper comment shifting the burden of proof to the defendants. The Court's entire cautionary instruction was:

---

[3] The prejudice was compounded by the Court's comment in front of the jury that Mr. Busby's testimony concerning the terminology for Kiddie Cushion was inconsistent. *See* Day 15 pm Tr. at 48:23–49:16. While Mr. Busby understands that the Court was seeking clarity, "the detrimental effect" of the Court questioning Mr. Busby's truthfulness in front of the jury—when the jury had to determine whether it would believe Mr. Busby or five cooperators—is "inescapable." *United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988). And the lack of a curative instruction following the Court's comment further prejudiced Mr. Busby as his credibility was unfortunately undermined. *See United States v. Fischer*, 531 F.2d 783, 787 and n.5 (5th Cir. 1976) (holding that "if the trial judge chooses to comment on the evidence, he must instruct the jury that they are not bound by his comments or questions" because of "the great influence which the trial judge necessarily exerts upon the jury").

> There is one thing I wanted to mention: Right at the end, when Mr. Johnson was talking, there was a **comment about certain witnesses not being called,** and let me make sure that -- that my instructions are clear.
>
> First of all, the **burden of proof** is always on the government; secondly, the defense has no obligation to call any certain witness or any witness at all; and then -- and then, thirdly, that it's perfectly proper for defense counsel to point out what they believe are holes in the government's case, and if that hole is also the -- they didn't call a certain witness, that's proper argument, and they can point that out.
>
> So -- you know, no one objected. I'm sure they didn't because we were late in the day, and -- and, quite frankly, as Mr. DeGuerin pointed out in his statement, the lawyers have gotten along very collegiately and worked together even though they -- everyone strongly believes in their side of the case, they worked together to try to present this case as best they can.
>
> But I wanted to emphasize to you that -- that I don't want anything that was said in -- in that last five minutes to confuse you or to -- for you to interpret that as a change on my instructions on **the burden of proof or who has the burden to call any witness**, okay?

Day 20 am Tr. at 3:9–4:6 (emphasis added). The effectiveness of this instruction was diminished because it was given the following day rather than at the time the government made the improper remarks. *Cf. United States v. Levine*, 80 F.3d 129, 136 (5th Cir. 1996) (noting that curative instruction must be "given in time to provide corrective guidance to the jury" and safeguard the defendant's "Fifth and Sixth Amendment rights to due process and a fair trial"). After the government's rebuttal closing argument, the jury went home for the evening. The jury no doubt considered the government's closing argument that evening, and it did so without any guidance that it should not consider the government's improper statements. *But see id.*

In addition, the Court provided no cautionary instruction addressing the government's improper vouching for its witnesses or the government's misstatements of the law. Thus, these prejudicial remarks were never corrected before the jury reached its verdict. The full jury instructions were read hours before the government's improper statements in rebuttal. So even if one of the instructions could be said to address the government's improper statements, it is highly

unlikely that a lay juror would remember such instruction hours later when the government's improper statements were made. Additionally, although the jury was given a copy of the instructions, it is highly unlikely that the jury read those 40-page instructions given that the jury returned its verdict on 33 counts after a four-week trial *within five hours*, while somehow also finding the time for two bathroom breaks and presumably, lunch. Day 20 am Tr. at 4:16 ("Jury out at 9:13 a.m."); Day 20 pm Tr. at 3:1–2 ("Proceedings commenced at 2:26 p.m. THE COURT: Counsel we have a verdict.").

The lack of effective curative instructions supports a conclusion that the government's improper remarks cast serious doubt on the correctness of the jury's verdict.

### 3.   The evidence at trial was extremely weak.

Finally, the evidence presented at trial against Mr. Busby was insufficient for any reasonable jury to conclude beyond a reasonable doubt that Mr. Busby committed the crimes charged. The government utterly failed to present *any* evidence to support key elements of the charges against Mr. Busby.

According to the government itself, the "heart" of its case was the cooperating witness testimony and GEX 1. The government presented *no evidence* whatsoever that Mr. Busby *agreed* to do anything in exchange for payments from Mr. Hutchison. Similarly, the government failed to carry its burden to establish that Mr. Busby received any payments from Mr. Hutchison (other than the gambling payments that Mr. Busby testified he received). Thus, the evidence at trial was extremely weak.

The three *Bennett* factors demonstrate that the government's improper remarks affected Mr. Busby's substantial rights as they "cast serious doubt on the correctness of the jury's verdict." *Greenlaw*, 76 F.4th at 338.

### 2. The Jury Instructions and Verdict Form regarding § 666 were improper.

The Jury Instructions were improper because they: (a) equated "bribery" with "receipt of money payment"; (b) failed to instruct the jury regarding the "official act" required to prove a violation of § 666; (c) instructed the jury only that accepting a "mere gratuity" is legal, implying that accepting a "large gratuity" is illegal; and (d) failed to properly instruct the jury regarding the nature and timing of the agreement required to violate § 666.

### a. The Verdict Form invited error by equating "bribery" with "receipt of money payment."

The Verdict Form invited error by stating that Counts 8 through 13 charged Mr. Busby with "receipt of money payment[s]" on specific dates. The Verdict Form described the bribery counts as follows:

| | |
|---|---|
| **Count 8:** | Alleging Bribery Concerning Programs Receiving Federal Funds, ***namely***, **receipt of money payment** on or about September 16, 2017 |
| **Count 9:** | Alleging Bribery Concerning Programs Receiving Federal Funds, ***namely***, **receipt of money payment** on or about October 4, 2017 |
| **Count 10:** | Alleging Bribery Concerning Programs Receiving Federal Funds, ***namely***, **receipt of money payment** on or about October 25, 2017 |
| **Count 11:** | Alleging Bribery Concerning Programs Receiving Federal Funds, ***namely***, **receipt of money payment** on or about November 4, 2017 |
| **Count 12:** | Alleging Bribery Concerning Programs Receiving Federal Funds, ***namely***, **receipt of money payment** on or about November 16, 2017 |
| **Count 13:** | Alleging Bribery Concerning Programs Receiving Federal Funds, ***namely***, **receipt of money payment** on or about December 13, 2017 |

ECF 160 at 4–5 (emphasis added). The Verdict Form improperly equated "receipt of money payment" with "Bribery Concerning Programs Receiving Federal Funds." *Id.* "Namely" means "that is to say."[4] The Verdict Form effectively told the jury that "receipt of money payment" is

---

[4] *Namely*, MERRIAM-WEBSTER (last accessed Sept. 16, 2025), available at https://www.merriam-webster.com/dictionary/namely; *see also Namely*, THE AMERICAN HERITAGE DICTIONARY OF THE

another way to say "bribery." The government significantly exacerbated this error through its persistent efforts throughout the trial to convince the jury that accepting a gift or gratuity is bribery—arguments that never received a curing instruction.

> **b. The Jury Instructions and Verdict Form failed to instruct the jury regarding any official act by Mr. Busby—the required "quo" for a bribery conviction.**

The conviction should also be vacated because the jury was not instructed on what constitutes an "official act" or instructed that they must find an official act to find Mr. Busby guilty. Instead, the Jury Instructions recited the text of § 666 without any definition of "official act." And they did not include any instruction on what Mr. Busby allegedly did in exchange for the alleged bribes—the required *quo* of a quid pro quo for a bribery conviction.

Section 666 prohibits a public official from accepting something of value in exchange for an *official act*. *Synder*, 603 U.S. at 5. An "official act" is any decision or action on any "question, matter, cause, suit, proceeding or controversy," which may at any time be pending, or which may by law be brought before any public official, in such official capacity, or in such official's place of trust or profit. *McDonnell v. United States*, 579 U.S. 550, 574 (2016). The question, matter, cause, suit, proceeding, or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. *Id.* at 569. To qualify as an official act, the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so. *Id.* at 572.

While *Snyder* did not directly address the question of whether § 666 requires an "official act" as defined in *McDonnell*, *Snyder* consistently referred to an "official act" as the *quo* to prove

---

ENGLISH LANGUAGE (last accessed Sept. 16, 2025), available at https://www.ahdictionary.com/word/search.html?q=namely ("That is to say; specifically").

bribery by a local official. *See United States v. Adams*, 760 F. Supp. 3d 6, 18 (S.D.N.Y. 2024) ("Notably, throughout its opinion, the Court used the words 'official act' to refer to § 666's *quo* requirement"). Even if *Snyder* did not explicitly hold that § 666 requires that the government allege and prove an "official act," *Snyder* made it abundantly clear that the government must prove that the defendant agreed to take *some specific act* in exchange for the payment: "[T]he Court explained that a bribe occurs where there is an agreement (the *pro*) made *before* the defendant acts (the *quo*), and that if there is no agreement before the act, then anything given of value after the fact is a gratuity." *Id.* (citing *Snyder* at 19). To reach an agreement at all, the parties must know what they are agreeing to. That is, they must reach an agreement as to what will be done in exchange for the bribe. *Id.*

Here, the Jury Instructions did not define "official act"—a term of art and the "quo" under § 666. Nor did they instruct the jury that they were required to find, beyond a reasonable doubt, that Mr. Busby agreed *beforehand* to accept something of value in exchange for an alleged official act. The instructions stated that the jury must find that Mr. Busby "accepted, or agreed to accept money or some other thing of value from Anthony Hutchinson with the intent to be influenced or rewarded in connection with any business, transaction, or series of transactions[.]" ECF 153 at 21. *Snyder* found this instruction, which tracks the language of the statute, inadequate. *See* 603 U.S. at 34. And use of generic terms like "business" and "transaction" significantly expand the specific, Supreme Court-defined term of art: "official act." Indeed, "business" means a "dealings or transactions especially of an economic nature" or "an immediate task or objective."[5] And

---

[5] *Business*, MERRIAM-WEBSTER (last accessed Sept. 16, 2025), available at https://www.merriam-webster.com/dictionary/business.

"transaction" means "an exchange or transfer of goods, services, or funds."[6] Both terms are far broader than "official act" as defined in *McDonnell*. 579 U.S. at 574. *See United States v. Kay*, 359 F.3d 738, 759 (5th Cir. 2004).

The only mention of official act was in a brief sentence: "Bribery requires a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." ECF 153 at 22. The Jury Instructions did not identify an alleged official act or even define "official act." Nor did the Jury Instructions identify an alleged "quid pro quo" or define the phrase. *Id.* at 22. These instructions were also insufficient as they failed to identify for the jury essential facts the jury must agree on to find Mr. Busby guilty of bribery.

The jury instructions improperly allowed the jury to convict Mr. Busby of bribery without finding that he agreed to take an official act in exchange for payment.

### c. The jury was improperly instructed only that a "*mere*" gratuity does not violate 18 U.S.C. § 666.

The jury instruction improperly included the qualifying word "mere" before "gratuity," when the jury should have been instructed that any gratuity—regardless of how small or large—does not violate 18 U.S.C. § 666. The Supreme Court in *Snyder* unequivocally held that § 666 "proscribes bribes to state and local officials but does not make it a crime for those officials to accept gratuities for their past acts." *Snyder*, 603 U.S. at 2, 20. The Court's holding was clear: "The answer is no" to whether § 666 criminalizes gratuities, regardless of their size, value, or perceived innocence. *Id.* at 8. The Court explicitly rejected the government's attempt to draw lines between small, innocent gratuities and large gratuities, holding that such distinctions are unworkable and constitutionally impermissible. *Id.* at 15–16. Critically, the Court made clear that

---

[6]   *Transaction*, MERRIAM-WEBSTER (last accessed Sept. 16, 2025), available at https://www.merriam-webster.com/dictionary/transaction.

this exclusion applies not only to gratuities but also to any *reward* for a past official act. *See id.* at 19 (emphasis added) ("Although a gratuity or reward offered and accepted by a state or local official after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate § 666").

Despite this clear mandate, the jury instructions in this case stated:

> This statute does not criminalize giving, offering to give, or agreeing to give **mere** gratuities or gifts to a person, or donations to a charitable organization, political candidate, or party, when no action or omission is requested in return.

ECF 153 at 19 (emphasis added). By stating only that "mere gratuities" are not criminalized, the Jury Instructions suggested to the jury that only small or slight gratuities are excluded from criminal liability, while "non-mere" or large gratuities are criminal. *Id.* While the term "mere" has different meanings, the Cambridge Dictionary explains that the word "mere" is "used to emphasize that something is not large or important."[7] By qualifying that only "mere gratuities"—that is small or unimportant gratuities—are not criminalized, the jury instructions implied that "large" gratuities are criminalized.

The Supreme Court left no doubt that it is impermissible to imply through jury instructions that the size of a gratuity should determine whether the gratuity is legal as no gratuity, regardless of its size, is criminalized by § 666. *Snyder*, 603 U.S. at 15–17. But the Jury Instruction here failed to adopt the Supreme Court's clear language and accordingly allowed the jury to conclude that

---

[7] *Mere*, CAMBRIDGE DICTIONARY (last accessed Sept. 16, 2025), *available at* https://dictionary.cambridge.org/us/dictionary/english/mere. The American Heritage Dictionary of the English Language provides three current definitions of "mere": (1) "Being nothing more than what is specified: a mere child; a mere 50 cents an hour"; (2) "Considered apart from anything else: shocked by the mere idea"; and (3) "**Small; slight**: could detect only the merest whisper." *Mere*, THE AMERICAN HERITAGE DICTIONARY (last accessed Sept. 16, 2025) *available at* https://www.ahdictionary.com/word/search.html?q=mere.

some gratuities (*i.e.*, large gratuities) are illegal while "mere" gratuities are not—precisely the ambiguity the Supreme Court sought to eliminate in *Snyder*. *See id.*

The confusion caused by the use of "mere" to qualify "gratuities" was compounded by the government's repeated presentation of testimony and closing arguments that the cooperating witnesses were guilty of bribery even though those witnesses testified that they only received gifts or gratuities—albeit "large" ones. The jury instruction was clearly erroneous and that error caused substantial prejudice because it allowed the jury to convict Mr. Busby if they concluded that he received large gratuities from Mr. Hutchison.

> **d.  The Jury Instructions failed to instruct the jury that an *agreement* between the alleged bribe payor and bribe receiver must exist *before* the agreed-upon official act.**

The Jury Instructions also failed to instruct the jury that a bribe requires an agreement to take an official act in exchange for payment *before* the official act is taken. *Snyder* made this requirement clear.

> Section 666 of Title 18 . . . prohibits state and local officials from accepting *bribes* that are promised or given before the official act. Those bribes are punishable by up to 10 years' imprisonment.
>
> The question in this case is whether §666 also makes it a crime for state and local officials to accept *gratuities* . . . that may be given as a token of appreciation after the official act. The answer is no.

*Id.* at 5 (emphasis in original).

The Supreme Court drew a clear distinction between payments given or promised before an official act and gratuities given after as a token of appreciation after the official act. *Id.*

> [G]ratuities after the official act are not the same as bribes before the official act. After all, unlike gratuities, bribes can corrupt the official act—meaning that the official takes the act for private gain, not for the public good. That said, gratuities can sometimes also raise ethical and appearance concerns. For that reason, Congress, States, and local governments have long regulated gratuities to public officials.

*Id.* at 6. Despite the Supreme Court's clear direction that a bribe must be agreed to *before* the official act, the Jury Instructions failed to inform the jury of this important requirement. The Jury Instructions stated, in relevant part:

> For you to find the defendant, Brian Busby, guilty of any of the counts alleging this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt as to that count:
>
> *Third*: That the defendant, Brian Busby, corruptly solicited or demanded for the benefit of any person, accepted, or agreed to accept money or some other thing of value from Anthony Hutchison with the intent to be influenced or rewarded in connection with any business, transaction, or series of transactions of the Houston Independent School District . . . .
>
> The term "intent to be influenced or rewarded" means that the defendant must have had a specific intent to act on a person's behalf in exchange for a thing of value received from a person. . . .
>
> Bribery requires a quid pro quo—a specific intent to give or receive something of value in exchange for an official act.

ECF 153 at 20–22. This description is deficient after *Snyder* because it fails to instruct the jury that a bribe must be "promised or given" *before* the official act. Under these Jury Instructions, the jury reasonably could have believed that it could convict Mr. Busby if it found he accepted money as a thank-you gift for an official act already taken. The Jury Instructions never stated that a bribe requires an agreement before the official act. *See Snyder*, 603 U.S. at 5.

This was a significant and prejudicial omission under the law. That omission was compounded by the numerous cooperating witnesses who testified that they never agreed to do anything in exchange for payment and yet pled guilty to bribery. And it was further compounded by the government's repeated argument that those who testified they only accepted payment after the fact with no intent to be influenced nonetheless conspired to commit bribery.

### 3. The Verdict Form constructively amended the Superseding Indictment.

The Verdict Form constructively amended the Superseding Indictment because it broadened the charges against Mr. Busby. The Verdict Form equated receiving money with bribery, and the only alleged fact provided to the jury was the alleged date of the payment. Further, neither the Verdict Form nor the Jury Instructions included the alleged payment amount or alleged official act purportedly taken in exchange for the alleged payment—the alleged quo—an essential element of the crime charged. Both Verdict Form errors allowed the jury to convict Mr. Busby for conduct not alleged in the Superseding Indictment.

An explicit or implicit constructive amendment of an indictment, which constitutes reversible error, occurs when:

> it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which she was charged.

*United States v. Reasor*, 418 F.3d 466, 475 (5th Cir. 2005) (citing cases). The Fifth Circuit consistently reverses convictions upon finding a constructive amendment. *See, e.g.*:

- *United States v. Chambers*, 408 F.3d 237 (5th Cir. 2005) (reversing a conviction for being a felon in possession of ammunition, where the indictment charged possession of whole ammunition "in or affecting commerce" and the jury was allowed to convict based on the travel of component parts, rather than the whole, of the ammunition in interstate commerce);

- *United States v. Adams*, 778 F.2d 1117, 1123 (5th Cir. 1985) (reversing a conviction for making a false statement and providing false identification in connection with the purchase of a firearm, where the indictment charged Adams with using a false name, but the jury was allowed to convict based on his use of a false address);

- *United States v. Salinas*, 601 F.2d 1279, 1287–91 (5th Cir. 1979) (reversing a conviction for misapplication of bank funds where the indictment charged that the defendant was a bank director, but the jury was allowed to convict if it found that he was an officer, director, agent, or employee);

- *United States v. Salinas*, 654 F.2d 319, 324 (5th Cir. 1981) (reversing a conviction for aiding and abetting the misapplication of bank funds where the indictment charged that the defendant aided and abetted a named officer where the jury was allowed to convict on proof that he aided and abetted a different officer);

- *United States v. Doucet*, 994 F.2d 169, 172 (5th Cir. 1993) (reversing a conviction for possession of an unregistered firearm modified to fire as a machine gun, where the indictment charged possession of the modified gun and the jury was allowed to convict on possession of the unassembled component parts); and

- *United States v. Nunez*, 180 F.3d 227 (5th Cir. 1999) (reversing a conviction where the indictment charged resisting arrest by assaulting an officer with a firearm, but the jury was allowed to convict if it found the defendant resisted in some way "though not be means of a dangerous weapon").

As these cases demonstrate, the Verdict Form constructively amended the Superseding Indictment because it invited the jury to convict Mr. Busby on a broader theory than that alleged in the Superseding Indictment.

First, the Verdict Form allowed the jury to convict based on Mr. Busby's alleged "receipt of payment"—a phrase that includes gifts and gratuities—rather than upon finding receipt of a bribe, as § 666 requires.

Second, neither the Verdict Form nor the Jury Instructions provided the jury with any alleged facts other than the alleged date of the payment. The jury was never told that it must find the facts alleged in the Superseding Indictment to establish the key elements of each bribery count—namely, the quo of the alleged quid pro quo. The jury was not instructed on (1) the alleged amount of the payment, or (2) what the payments were allegedly given for. Rather, the jury was invited to convict Mr. Busby simply if it found that he received any amount of money on or about a specific date. This was a constructive amendment, which requires reversal and vacatur of the verdict per se. *See United States v. Flores*, No. 22-50910, 2025 WL 561417, at *6 (5th Cir. Feb. 20, 2025), cert. denied, No. 24-7297, 2025 WL 1787801 (U.S. June 30, 2025).

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 32**

The Superseding Indictment alleged that Mr. Busby "assisted [Hutchison] in obtaining or retaining business with HISD," "helped award HUTCHISON HISD jobs," and "took steps to expedite payment by HISD to HUTCHISON." ECF 42 ¶¶ 16. But the Jury Instructions did not reference *any* quo at all—not even the vague allegations in the Superseding Indictment. The Jury Instructions simply recited the text of the statute and the Fifth Circuit Pattern Jury Instructions but utterly failed to instruct the jury what the alleged facts were. ECF 153 at 21.

Because the Jury Instructions and Verdict Form failed to advise the jury regarding any alleged "quo," the jury was allowed to convict Mr. Busby on a broader set of allegations than those charged in the Superseding Indictment. *See Snyder*, 603. U.S. at 19.

### 4. The government failed to present evidence that Mr. Busby agreed to take an official act in exchange for a payment.

Aside from the Jury Instructions and Verdict Form issues, the government completely failed to allege or prove that Mr. Busby took an official act in exchange for payment.

The Superseding Indictment alleged that Mr. Busby "assisted" and "helped" Mr. Hutchison get work and "took steps" to expedite payment to Mr. Hutchison. ECF 42 at ¶¶ 14, 16, But these vague assertions do not qualify as an official act for purposes of § 666 bribery. *See Kay*, 359 F.3d at 759 ("Without more, the words 'assists' and 'business' are certainly candidates for classification as generic terms. There are innumerable ways and degrees of assisting; and . . . 'business' is as broad as it is tall."). And the government failed to present any evidence that Mr. Busby took an official act in exchange for payment.

### a. "Helping" or "Assisting" Mr. Hutchison obtain work with HISD.

The Superseding Indictment includes vague allegations that Mr. Busby "helped award" Mr. Hutchison "HISD jobs," and Mr. Busby "assisted him in obtaining or retaining business with HISD." ECF 42 at ¶¶ 14, 16.

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 33**

The Superseding Indictment does not allege that Mr. Busby himself awarded or agreed to award a contract or give any work at all to Mr. Hutchison. *Cf. United States v. Nelson*, No. 10-00099-BAJ-SCR-1, 2019 WL 1560437, at *1 (M.D. La. Apr. 10, 2019) (finding an official act when the public official actively granted government contracts and grants in exchange for personal payments); *see also United States v. Grace*, No. 10-00143, 2019 WL 4126505, at *2 (M.D. La. Aug. 28, 2019) (finding an official's explicit promise and actions to ensure that property was sold to the company providing the bribes constituted an official act).

Put simply, for the alleged conduct to qualify as an official act, Mr. Busby would have had to do more than discuss or recommend Hutchinson's services. *See McDonnell*, 579 U.S. at 573 (holding that conversations with potential investors about the quality of the alleged bribe-giver's product and suggesting to state employees responsible for employee benefits that a product would be "good for" state employees did not constitute official acts). Simply calling meetings or having conversations about Mr. Hutchinson are insufficient to establish an official act. *See id.*

At trial, the government presented some evidence that Mr. Busby encouraged others to use Mr. Hutchison's companies Southwest Wholesale and Just Construction. For example, Mr. Sanders testified that Mr. Busby initially told him that "if there was any availability for Mr. Hutchison to get some work to use him because he's a good guy." Day 2 pm Tr. at 31:12–14. Mr. Sanders testified that later, Mr. Busby asked Mr. Sanders if any work could be carved out from the bond construction projects for Southwest Wholesale. *Id.* at 33:19–34:7. Mr. Sanders further testified that he understood that Mr. Busby would not receive any payment for Mr. Sanders giving Mr. Hutchison work. *Id.* at 40:15–21. Thus, the government's own witness made it clear that Mr. Busby did not stand to receive any payments for encouraging Mr. Sanders to use Southwest Wholesale. *See id.* Indeed, consistent with Mr. Sanders' testimony, the government presented no

evidence that Mr. Busby received any payments in connection with work Mr. Sanders gave Southwest Wholesale.

Similarly, there was *no* evidence presented that Mr. Busby ever received *any* payment for work done by Just Construction. At trial, Mr. Hoskins testified that in approximately 2017, Mr. Busby told Mr. Hoskins that he wanted Just Construction to get a high score on the 2017 RFP evaluation so that Just Construction could be an annual vendor. Day 4 pm Tr. at 122:6–17. And Mr. Hoskins testified that after Just Construction became an annual vendor, Mr. Busby encouraged him to give Just Construction business. *Id.* at 124:20–22. But Mr. Hoskins did not testify that Mr. Busby received any payment from Mr. Hutchison at all, much less for work associated with Just Construction projects. *See id.* at 110–171; Day 5 am Tr. at 4–145. And even GEX 1—the sole basis of Counts 8 through 13—did not tie a single Just Construction project to Mr. Busby. *See* GEX 1. The Superseding Indictment alleged that several purported payments on page three of GEX 1 were payments to Mr. Busby, but "BB" does not appear anywhere on page three of GEX 1. Thus, the government presented *no* evidence whatsoever that any of the alleged payments related to Just Construction projects were payments to Mr. Busby.

Not a single government witness testified that Mr. Busby received any payments from Mr. Hutchison.

The allegations in Counts 8 through 13 are drawn directly from GEX 1. Based on the government's interpretation of GEX 1:

- Counts 8 and 9 allege payments related to grounds maintenance work performed by Southwest Wholesale;

- Counts 11 and 13 allege payments related to work performed by Just Construction; and

- Counts 10 and 12 allege payment related to both grounds maintenance work performed by Southwest Wholesale and work performed by Just Construction.

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 35**

### i.  Counts 8 and 9—Southwest Wholesale

The government never connected the payments alleged in Counts 8 and 9 to any official act. At trial, the government presented evidence that in 2011, Mr. Busby was on the evaluation committee when Southwest Wholesale was awarded an annual contract. Day 9 pm Tr. at 21:16–32:10 (Mr. Salazar testifying that Mr. Busby ranked Grotech first and Southwest Wholesale second). There was also evidence that in 2012, Mr. Busby was involved in the decision to award the full contract to Southwest Wholesale. *Id.* at 43:5–46:15 (Mr. Salazar testifying that a new RFP was issued in 2012 after multiple complaints about Grotech).

Relying entirely on GEX 1, Counts 8 and 9 allege that Mr. Busby received payments "Related to . . . Project(s) at the Listed School(s)" from Mr. Hutchison. According to the government, those projects were all Southwest Wholesale grounds maintenance projects. *See* GEX 1; Government Exhibit 2 ("GEX 2"). And according to GEX 1 and GEX 2, none of the projects were ordered by Derrick Sanders, and anyway, Mr. Sanders testified that he understood Mr. Busby would not receive any payment in connection with work Mr. Sanders gave Southwest Wholesale.

The Superseding Indictment did not allege an official act in connection with Count 8 or 9, and the government presented no evidence that Mr. Busby did anything related to the Southwest Wholesale contract after 2012—five years before the alleged payments. The government presented no evidence tying these purported 2017 payments to any action, much less an official act.

### ii.  Counts 11 and 13—Just Construction

The government never connected the payments alleged in Counts 11 and 13 to Mr. Busby. Again, relying entirely on GEX 1, Counts 11 and 13 allege that Mr. Busby received payments "Related to . . . Project(s) at the Listed School(s)" from Mr. Hutchison. According to the government, those projects were all Just Construction projects. *See* GEX 1 at 3; GEX 2 at 7–8. The projects alleged in Counts 11 and 13 all appear on page three of GEX 1, but the letters "BB"

do not appear anywhere on page three. *See id.* No witness testified that Mr. Busby ever received any payment from Mr. Hutchison. There is simply no evidence whatsoever that Mr. Busby received the alleged payments in Counts 11 and 13.

### iii. Counts 10 and 12—Southwest Wholesale and Just Construction

Counts 10 and 12 suffer from a combination of the problems afflicting the other bribery counts. Counts 10 and 12 allege payments related to both Just Construction and Southwest Wholesale projects. According to the government, the Just Construction-related payments all appear on page three of GEX 1, and as noted above, the letters "BB" do not even appear on that page. Thus, GEX 1 did not provide any evidence that Mr. Busby received the alleged payments.

Similarly, for the purported Southwest Wholesale related projects included in Counts 10 and 12, similar to Counts 8 and 9, the government presented no evidence that Mr. Busby took any action in connection with the Southwest Wholesale grounds maintenance contract after 2012, five years before the alleged payments. In sum, the government failed to present *any* evidence that Mr. Busby received any alleged Just Construction-related payments, and the government failed to allege or present any evidence that Mr. Busby took any action in connection with any alleged Southwest Wholesale-related payments.

The government utterly failed to present evidence that Mr. Busby received the payments alleged in Counts 8 through 13 in exchange for any official act. And because the jury was never told the alleged payment amounts or the alleged projects related to those payments, the jury could not assess whether GEX 1 provided evidence to support the charges in Counts 8 through 13— charges based entirely on GEX 1.

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 37**

### b.  "Took Steps to Expedite Payment by HISD."

The Superseding Indictment also alleges that Mr. Busby "took steps to expedite payment by HISD" to Mr. Hutchison, but the payment process is a routine administrative process and the Superseding Indictment does not allege any specific action by Mr. Busby. Mr. Salazar testified that Mr. Busby had meetings to discuss why payments owed to vendors, including, but not limited to, Mr. Hutchison's companies, were significantly past due. Day 9 Tr. at 7:19–10:24. Mr. Salazar also testified that Superintendent Lathan and Mr. Busby asked to put Mr. Hutchison, along with several other vendors, on immediate (rather than 30-day) payment terms. Day 11 pm Tr. at 5:8–7:7. Informal communications and day-to-day normal work activities, including asking why payments to a vendor are significantly past due, is not an "official act" as defined for purposes of the bribery statutes. *See McDonnell*, 579 U.S. at 571, 573 (holding that the government failed to allege (or prove) an "official act" despite extensive evidence that the defendant organized several events and meetings for the alleged bribe-giver to meet government officials who could take action that would help the alleged bribe-giver).

The Superseding Indictment is completely devoid of any allegation that Mr. Busby agreed to commit an official act or exert pressure on any individual to commit an official act to "expedite" payment to Mr. Hutchison. Similarly, the evidence at trial failed to establish that Mr. Busby took an official act, or received any payment in exchange for an official act, in connection with expedited payment to Mr. Hutchison.

### c.  Skillern-Jones 2017 HISD Board Agenda and Vote.

Finally, the Superseding Indictment alleges that Ms. Skillern-Jones "caused to be placed on a 2017 HISD Board agenda, and voted to approve, an expenditure of funds for school landscaping and construction projects that were awarded to [Mr. Hutchison]. ECF 42 at ¶ 17. However, the Superseding Indictment fails to allege that Mr. Busby took any official act or had

any agreement to do so. Regarding Mr. Busby, the Superseding Indictment alleges that he "facilitated the bribery relationship" and "personally delivered" bribe payments to [Ms.] Skillern-Jones. *Id.* But neither of these is an "official act."

Ms. Skillern-Jones testified that after she decided to use leftover bond funds for outdoor projects at two schools, she contacted Mr. Busby to discuss how to get those projects completed. *See* Day 5 pm Tr. at 35:8–38:6. Ms. Skillern-Jones testified that she and Mr. Busby agreed that if they used Mr. Hutchison for the project they could get something for it. *Id.* Ms. Skillern-Jones identified the projects that she would put on the agenda and vote on *before* ever purportedly speaking with Mr. Busby about potentially getting something from Mr. Hutchison. *Id.* Ms. Skillern-Jones testified that she never had an agreement with Mr. Hutchison to get a payment. *Id.* at 117:2–21.

Ms. Skillern-Jones did not testify that Mr. Busby had an agreement with Mr. Hutchison or that Mr. Busby received any payment. The government presented no evidence that Mr. Busby took any official act related to these projects. And, as set forth in Section A(4) regarding Counts 9 and 12, the government failed to present evidence that the alleged payments were made in exchange for an official act.

The Superseding Indictment failed to allege, and the government failed to present evidence, that Mr. Busby agreed to take an official act or exert pressure on another to take an official act in exchange for a payment.

### 5.    Government Exhibit 1 contained testimonial statements that violated Mr. Busby's rights under the Confrontation Clause of the Sixth Amendment.

The Court's admission of GEX 1—an unauthenticated handwritten "ledger" that served as the government's chief piece of evidence—constituted reversible error. The government was clear from the outset of the trial: GEX 1 was not only its "most interesting piece of evidence in the case,"

but the "most important document in the case." Day 2 am Tr. at 24:15–17. GEX 1 provided the sole factual basis for the bribery counts. Day 19 pm Tr. at 29:9–30:4. According to the government, the handwritten ledger belonged to Mr. Hutchinson, who used it to "track his bribe payments to various individuals over a four-month period in 2017." Day 2 am Tr. at 17–20. Yet the government never authenticated that GEX 1 was a *bribery* ledger; therefore, the statements in the ledger were inadmissible hearsay. Further, because GEX 1 was never authenticated, the statements in GEX 1 were testimonial and violated Mr. Busby's rights under the Confrontation Clause of the Sixth Amendment. This error concerning the government's "most important" piece of evidence tainted the entire trial and led to the jury's guilty verdict, thereby necessitating that Mr. Busby be acquitted or afforded a new trial.

### a. GEX 1 was never authenticated.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. Am VI. In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment prohibits the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had [] a prior opportunity for cross-examination." 541 U.S. 36, 53–54 (2004). Courts generally deem coconspirator statements made in furtherance of a conspiracy to not qualify as testimonial, but only if the statements are authenticated. *See, e.g.*, *United States v. Jackson*, 636 F.3d 687, 694 (5th Cir. 2011); *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005).

Pursuant to Federal Rule of Evidence 901, the proponent of a piece of evidence must "produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901. The Fifth Circuit has not determined the "precise contours of trustworthiness

necessary to authenticate" alleged bribery ledgers. *See Jackson*, 636 F.3d at 693. That said, courts

generally consider the following when determining whether other types of ledgers are authentic:[8]

> (1) whether the ledger was found in the home of a defendant known for committing
> the crime alleged; and
>
> (2) whether the government's witness testified that she:
>
>> (a) worked for the defendant who allegedly created the ledger;
>>
>> (b) the ledger resembled the defendant's other ledgers *concerning the same
>> types of transactions*; and
>>
>> (c) the handwriting on the ledger was similar to the defendant's
>> handwriting.

*Id.* (citing *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993)).

The Court conditionally admitted GEX 1—over Mr. Busby's Confrontation Clause

objection—after noting that ledgers are not testimonial under Fifth Circuit law and therefore do

not implicate *Crawford*. *See* Day 2 am Tr. at 75:22–76:5. The government was clear that it believed

GEX 1 avoided a Confrontation Clause problem because it was the statement of a co-conspirator

made in furtherance of the conspiracy under Rule 801(d)(2)(E). *See* Day 1 Tr. at 162:24–163:1

("But as for purposes of evidence, [GEX 1 is] a co-conspirator statement that should come in under

the Rules of Evidence."). Notwithstanding the government's argument and the Court's conditional

admission, the Court never found, and the government never established, that GEX 1 was

authentic—the prerequisite to its admissibility. *See Jackson*, 636 F.3d at 694. Indeed, the

government presented GEX 1 to the jury with its first witness, Derrick Sanders, before laying any

foundation at all for its admission. Day 2 pm Tr. at 72:24–76:7.

---

[8] Although the Fifth Circuit noted that the test could be used to determine if the ledger was a
business record, it applied the same analysis when considering whether the ledger was a statement
made in furtherance of a conspiracy under Rule 801(d)(2)(E). *See Jackson*, 636 F.3d at 693–94
("As with business records . . ."). Further, *Arce*, which *Jackson* relied on, only concerned Rule
801(d)(2)(E), not Rule 803(6). *See Arce*, 997 F.2d at 1128.

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 41**

According to the government, GEX 1 is Mr. Hutchinson's "handwritten ledger . . . [that] tracks his bribe payment to various individuals over a four-month period in 2017." Day 2 am Tr. at 24:18–20; Day 1 Tr. at 160:23–25 (arguing that the ledger "prepared by Hutchinson delineates this conspiracy and the bribe payments that were made as they're tied to HISD schools"). The government asserted that the letters "BB" referenced Brian Busby, pointing to Mr. Busby in front of the jury, and stated that "the ledger indicates that Hutchinson paid Busby a lot of money, a lot of bribes." Day 2 pm Tr. at 27:7–10. Yet despite resting its entire case on its claim that GEX 1 is a bribery ledger, the government failed to authenticate that GEX 1 was indeed a *bribery* ledger. The list of the government's authentication shortcomings is overwhelming.

*First*, the government did not establish that the ledger was found at the home of someone known to engage in bribery. *See Jackson*, 636 F.3d at 693 (noting that "the ledgers were found in the home of a *known drug trafficker* (emphasis added); *Arce*, 997 F.2d at 1127 ("Police recovered the ledgers from Nunez's home . . . a *known cocaine trafficker*[.]"). On the contrary, the evidence established that the ledger belonged to a *known gambler*. Day 2 pm Tr. at 56:3–10 (describing Mr. Hutchinson's gambling addiction); Day 18 pm Tr. at 29:6–25 ("Unfortunately, he's a compulsive gambler. He's a compulsive gambler."). Mr. Hutchison had never previously been charged with bribery. And the government's own cooperating witnesses did not testify that Mr. Hutchison ever paid a "bribe."

*Second*, the government did not present any evidence, or elicit any testimony, from anyone who worked with Mr. Hutchinson that supported that GEX 1 resembled other ledgers concerning the same types of transaction: *i.e.*, bribery. *See Jackson*, 636 F.3d at 693. On the contrary, the only witness remotely familiar with the ledger—Mr. Hutchinson's former assistant, Diane Jones—testified that the ledger was a *gambling ledger, not a bribery ledger*. Day 18 pm Tr. at 32:15–33:7

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 42**

("All I know is that it's a gambling sheet"). In fact, Mr. Hutchinson's assistant testified that she was working with Mr. Hutchinson on his gambling debts when she saw GEX 1. *Id.* at 68:24–69:4.

The "type of transaction" distinction is not only critical, but fatal for the government. The Fifth Circuit requires that a witness corroborate that an alleged ledger resembles other ledgers concerning the same type of transaction. *Jackson*, 636 F.3d at 693. In *Jackson*, the Fifth Circuit repeatedly stated that the notebooks had to be authenticated as "*drug* ledgers" that documented "narcotic transactions." *Id.* at 691–92 (emphasis added). Likewise, in *Arce*, the Fifth Circuit held that drug ledgers were properly authenticated in a drug conspiracy case where a witness who worked with the defendant—a known drug trafficker—testified that "these particular ledgers resembled *drug ledgers* that Nunez maintained." *Arce*, 997 F.2d at 1128 (emphasis added). And the Eighth Circuit underscored the "type of transaction" holding three years later in *Young*, noting that in *Jackson*, the issue with the ledger was, among other things, that the "subject matter of the ledger was [] unclear." *United States v. Young*, 753 F.3d 757, 774 (8th Cir. 2014).

That the offered ledgers must concern the same type of transaction as the ledgers they supposedly resemble is rooted in Rule 801(d)(2)(E). *See Jackson*, 636 F.3d at 693–94. For a ledger to be properly authenticated under Rule 801(d)(2)(E), it must be made "in furtherance of *the* conspiracy," not "a" conspiracy. Fed. R. Evid. 801(d)(2)(E). This is because the statement must "advance the ultimate objects of *the* conspiracy." *United States v. Ebron*, 683 F.3d 105, 135 (5th Cir. 2012) (emphasis added). Thus, if an alleged ledger concerns a different type of transaction than the transactions at the base of the charged conspiracy, then the statements in that ledger cannot be deemed in furtherance of the conspiracy at all. This is exactly what the Fifth Circuit was concerned with in *Jackson*. The Fifth Circuit held that the record did not "reflect whether the ledger[] record[ed drug] transactions at all." *Jackson*, 636 F.3d at 693. It then explicitly stated that:

"The ledger entries do not include any indication of the term 'cocaine' *and thus do not facially convey that they are applicable to the conspiracy charged*." *Id.* (emphasis added).

Here, the only testimony from a witness with personal knowledge of GEX 1 was that it was a "gambling sheet," not a "bribe ledger." *See* Day 18 pm Tr. at 32:15–33:7. But the Superseding Indictment did not allege a gambling conspiracy. Furthermore, there was no evidence from anyone familiar with Mr. Hutchinson's records to support that GEX 1 resembled a *bribery* ledger, as *Jackson* requires. *See Jackson*, 636 F.3d at 693. Because the only testimony recognized under *Jackson* established that GEX 1 not only resembled Mr. Hutchinson's gambling ledgers, but *was* Mr. Hutchinson's gambling ledger, the government failed to meet the "same type of transaction test" and the Court had no evidence to "reflect whether the ledger[] record[ed bribery] transactions at all." *Id.* Put differently, the government failed under *Jackson* and Rule 901 to prove that GEX 1 is what the government purports it to be: a bribery ledger made in furtherance of a bribery conspiracy.

*Third*, the government's witnesses themselves raised serious concerns about the authenticity of GEX 1. Because the government did not have a witness who worked with Mr. Hutchinson to testify that GEX 1 resembled other *bribery* ledgers, the government called Special Agent Paul Kindred to try to save its case. But Special Agent Kindred demonstrated the very reason that the Fifth Circuit requires testimony from a witness who is familiar with, and can thereby corroborate, the ledger and its subject. Special Agent Kindred testified that the government found purchase orders, invoices, and "handwritten notes" near the ledger, and that the notes were "just like some of the notes that we've reviewed." *See* Day 3 pm Tr. at 62:12–20. But Special Agent Kindred did not describe how the notes were similar, much less testify that those handwritten notes were also "bribery ledgers." *Id.*

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 44**

Even more importantly, though, Special Agent Kindred admitted that he could not tell what GEX 1 was when he found it; rather, he "had to look at other information to make sense of" GEX 1. *See id.* at 98:3–13. In other words, Special Agent Kindred admitted that it was not apparent from the face of the handwritten notes that the notes were a "bribery ledger." *Id.* Special Agent Kindred had to review bank records, proposals, invoices, emails, and cell phone records to reach *his own conclusion* on what he believed GEX 1 concerned. *Id.* at 84:19–24; *see also* Day 14 am Tr. at 63:3–7 (IRS Agent Jason Webb admitting that "from the time" the government got GEX 1, the government interpreted it as a bribe ledger). He then "interpreted," or "translated," GEX 1 for the jury even though no one familiar with the document authenticated it as a bribery ledger. *See* Day 3 am Tr. at 89:17–22 (testifying what "LS" and "IRR" stood for based on his own conclusions); *id.* at 108:21–109:4 (testifying that he reviewed emails, financial records, and cell phone data to try to discern what "paid LV 9/16" meant, then telling the jury his personal conclusion).

Yet even as Special Agent Kindred attempted to authenticate a document that he admitted was unclear, he conceded that there were inconsistencies in GEX 1 "that we cannot explain." Day 3 pm Tr. at 166:1–2. Specifically, Special Agent Kindred admitted that while he attempted to match entries in GEX 1 with payments made to Just Construction or Southwest Wholesale to reach his conclusion that GEX 1 was a bribery ledger, he could only do so *29% of the time*. *Id.* at 165:4–12. Far from authenticating GEX 1, Special Agent Kindred conceded that his chosen methodology for determining whether GEX 1 was a bribery ledger resulted in a "positive" match less than one-third of the time. *Id.* This is the very type of testimony that *Jackson* prohibits. *See Jackson*, 636 F.3d at 691–93 ("The government introduced the notebooks at trial solely through the testimony of Officer Hight, who twice stated that his analysis of them was "based on [his] experience as an officer and nothing from what was obtained from Mr. Valdez.").

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 45**

And it only gets worse for the government. Cooperator and former HISD employee, Gerron Hall, testified that GEX 1 did not state accurate dates or monetary amounts. *See* Day 4 pm Tr. at 78:5–18. Cooperator and former HISD employee, Alfred Hoskins, testified that in his first meeting with the government, the government told him that GEX 1 was a "bribery ledger," to which he responded that he did not take any bribes. *See* Day 5 am Tr. at 32:10–33:11. He further testified that he did not receive "$5,000 at Chathum" as the government claimed based on GEX 1. *Id.* at 124:11–25. And he also testified that none of the times, places, or amounts in GEX 1 were accurate. *Id.* at 127:1–13. Cooperator and former HISD board member, Rhonda Skillern-Jones, testified that GEX 1 did not accurately reflect payments to her, and she was not paid $20,000 in 2017, as the government claimed based on its interpretation of GEX 1. Day 5 pm Tr. at 57:16–58:1; *id.* at 106:11–16. And FBI forensic accountant Kathryn Prado testified that she could not match any cash deposits in Mr. Busby's bank accounts with the amounts recorded on GEX 1. *See* Day 19 am Tr. at 81:9–12. This testimony underscores that the government utterly failed to authenticate GEX 1.

*Finally*, the government's authentication efforts suffer from several other significant flaws. GEX 1 never states that it traces "bribes." *Jackson*, 636 F.3d at 693 (noting that the "ledger entries do not include any indication of the term 'cocaine'"). The government did not offer any handwriting analysis. *Id.* And no evidence was offered to establish when GEX 1 was created, including whether it was created as a real-time record during the course of the alleged conspiracy. *Jackson*, 636 F.3d at 694 (noting that without proper testimony "the events recorded therein could have taken place at times outside the course of the relevant drug-trafficking conspiracy"). Therefore, like in *Jackson*, the government "failed to satisfy virtually all of the authentication requirements with respect to the alleged [bribery] ledgers." *Id.*

**b. The admission of GEX 1 violated Mr. Busby's Sixth Amendment rights.**

The Confrontation Clause of the Sixth Amendment prohibits courts from admitting: "(1) testimonial out-of-court statements; (2) made by a person who does not appear at trial; (3) received against the accused; (4) to establish the truth of the matter asserted; (5) unless the declarant is unavailable and the defendant had a prior opportunity to cross examine him." *Id.* at 695 (citation omitted). *Crawford* defined "testimony" as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51. It is the government's burden to defeat a "properly raised Confrontation Clause objection by establishing that its evidence is nontestimonial." *Jackson*, 636 F.3d at 695 and n.4. The Fifth Circuit has already held that where the government fails to authenticate a ledger and uses the statements within the ledger as "the very testimony a [co-defendant] 'would be expected to provide if called at trial,'" then the "ledgers are testimonial evidence that violates the Confrontation Clause." *Jackson*, 636 F.3d at 696–97 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009)).

The Court found GEX 1 to be nontestimonial because it was a "ledger." *See* Day 2 am Tr. at 76:22–77:5. But because GEX 1 was never authenticated, as established above, GEX 1 is hearsay, and there was no basis to find that GEX 1 is nontestimonial. *See Jackson*, 636 F.3d at 697. In addition to *Jackson*'s holding, GEX 1 easily qualifies as testimonial under *Crawford* given the agents' testimony and the government's arguments. As to the second and fifth factors, Mr. Hutchinson allegedly handwrote GEX 1 and Mr. Busby never had the opportunity to cross-examine him about GEX 1's contents. *See, e.g.*, Day 3 pm Tr. at 73:2–4. As to the first and third factors, the government offered GEX 1 as "proof" that Mr. Hutchinson and Mr. Busby engaged in a bribery conspiracy and Mr. "Hutchinson paid [Mr.] Busby a lot of money, a lot of bribes." *See, e.g.*, Day 2 am Tr. at 27:7–10; *id.* at 24:18–20 ("[T]his ledger tracks [Mr. Hutchinson's] bribe

payments to various individuals over a four-month period in 2017."); Day 2 pm Tr. at 79:17–19 ("Q. And when you and Hutchinson used the term "BB," who are you referring to? A. Brian Busby."). The government specifically used Mr. Hutchinson's alleged statements in GEX 1 as affirmations of fact against Mr. Busby to "relate (through [the government's witnesses'] translation for the jury) the very testimony that [Mr. Hutchinson] 'would be expected to provide if called at trial.'" *Jackson*, 636 F.3d at 696 (quoting *Melendez-Diaz*, 557 U.S. at 310); *United States v. Duron-Caldera*, 737 F.3d 988, 993 (5th Cir. 2013) (same).

And as to the fourth factor, there can be no doubt that the government offered GEX 1 to prove the truth of the matter asserted as the government made clear in closing: GEX 1 "is not confusing. And it's documenting bribe payments, which are corroborated by the evidence. And, ultimately, a conspiracy was formed and was part of the scheme to get Hutchinson work so that BB, Brian Busby, and other HISD officials could get paid." Day 19 pm Tr. at 51:11–15. As *Jackson* held in nearly identical circumstances, GEX 1, accompanied by law enforcement testimony, "constitute[s] the 'functional equivalent' of [Mr. Hutchinson's] own 'ex parte in-court testimony' against [Mr. Busby] as having" engaged in bribes with Mr. Hutchinson. *Jackson*, 636 F.3d at 696 (quoting *Melendez-Diaz*, 557 U.S. at 310 (quoting *Crawford*, 541 U.S. 36 at 51)). "In other words, [GEX 1] "[does] precisely what a witness does on direct examination." *Id.* (quoting *Davis*, 547 U.S. at 830). "Thus it is clear that, as presented to the jury in this case, the ledgers are testimonial evidence that violates the Confrontation Clause." *Id.* at 697.

### c. The admission of GEX 1 was reversible error entitling Mr. Busby to either acquittal or a new trial.

A verdict can only survive a Confrontation Clause violation if "'there was [no] reasonable possibility that the evidence complained of might have contributed to the conviction.'" *United States v. Alvarado-Valdez*, 521 F.3d 337, 341 (5th Cir. 2008) (quoting *Chapman v. California*, 386

U.S. 18, 24 (1967) (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87 (1963))). "The government bears the burden of establishing the error is harmless beyond a reasonable doubt." *Id.* (citing *United States v. Akpan*, 407 F.3d 360, 377 (5th Cir. 2005)). The government cannot carry its burden here as there is no colorable argument that GEX 1 did not contribute to the jury's verdict of guilty.

 *United States v. Sarli* is instructive. 913 F.3d 491, 496 (5th Cir. 2019). In *Sarli*, the Fifth Circuit held that a Confrontation Clause violation was harmless "for one simple reason: The prosecution's case turned on statements made by in-court witnesses and not on any out-of-court statement." *Id.* The exact opposite is true here. The government admitted that its case "turned on" GEX 1, it's self-proclaimed "*most important*" exhibit. *See* Day 2 am Tr. at 24:15–17. GEX 1 was the *only* evidence the government presented to support the alleged dates, payment amounts, and related projects alleged in Counts 8 through 13. The government led with GEX 1 in its opening (*see id.*), and it concluded with GEX 1 in its closing: "All right. And let's talk about the infamous ledger . . . I think it's undisputed at this point that this is Mr. Hutchinson's ledger." Day 19 pm Tr. at 29:9–10, 19–20. The government continued: "Ladies and gentlemen, I submit to you that evidence is fully established beyond a reasonable doubt that BB is Brian Busby. This ledger is not confusing. And it's documenting bribe payments[.]" *Id.* at 51:9–12. Without anyone who had firsthand knowledge of what GEX 1 actually is, the government effectively rested its entire prosecution of Mr. Busby on GEX 1—an out-of-court statement allegedly created by his co-defendant that was offered to establish the truth of the matter asserted. There can be no doubt that GEX 1 contributed to the jury's verdict.

 While Mr. Busby's case is the exact opposite of *Sarli*, it is nearly identical to the cases that *Sarli* recognizes as providing good cause to reverse for a Confrontation Clause violation. *Sarli* specifically stated: "By contrast, in cases where [the Fifth Circuit] granted relief, the defendant's

involvement was hotly contested, and the prosecution depended on out-of-court testimony to identify the defendant as a participant in the crime." *Sarli*, 913 F.3d at 496–97 (discussing *United States v. Kizzee*, 877 F.3d 650 (5th Cir. 2017), *Jackson*, and *Alvarado-Valdez*). Mr. Busby's case fits this well-recognized fact pattern.

Mr. Busby "hotly contested" his alleged involvement in a bribery scheme throughout the entirety of the trial. *See, e.g.*, Day 2 am Tr. at 73:21–23 (arguing that "the evidence is going to show that [Mr.] Busby did not take money as they think this ledger says"). In fact, Mr. Busby took the witness stand himself to defend his innocence. Day 15 am Tr. at 49:1–5 ("But one thing we never, ever had a discussion about or ever experienced was a bribe. It was always in gambling. It was also in: Here's a gift for your daughter from me and my wife; a gift for my kids from him and his wife. But it wasn't monetary; it was gifts."); *id.* at 49:6–11 ("Q. Did Hutch ever give you money to do something in your job? In other words, a quid pro quo, for you to do something for him in connection with your job? A. No, and he never had to."). Mr. Busby also objected to the admission of GEX 1 before the trial even started, arguing that:

> We have no responsibility for [GEX 1]. We never saw it until after we started doing discovery here. There's no evidence that it was ever shared. That's one of the things that is a problem with a joint trial where there's evidence against one accused that doesn't apply to another. There's no evidence that he ever saw it, approved of it, knew what it was -- that Mr. Busby did; so we do have an objection to [GEX 1].

Day 1 Tr. at 160:11–17.

Further, as demonstrated above, the government depended on GEX 1 to identify Mr. Busby as having allegedly participated in a bribery scheme. *See e.g.*, Day 2 am Tr. at 24:15–17; Day 19 pm Tr. at 29:9–10, 19–20; *id.* at 51:9–12. Like in *Jackson* and *Alvarado-Valdez*, the government relied heavily on the very evidence that created the Confrontation Clause violation. Thus, the government cannot "show that the tainted evidence did not contribute to the conviction, because

the government's closing argument relied on that very evidence." *Alvarado-Valdez*, 521 F.3d at 343; *see also Jackson*, 636 F.3d at 698 ("Given the manner in which the government relied on this inadmissible evidence in both its case in chief and its closing argument, we cannot say that the evidence did not contribute to the jury's verdict.".). Mr. Busby is therefore entitled to acquittal or, at the very least, a new trial.

### B.  The Court should vacate Mr. Busby's conspiracy conviction on Count 1.

The government failed to present sufficient evidence that Mr. Busby accepted bribes, as set forth in detail Section A, and for the same reasons, the government failed to prove that Mr. Busby conspired to commit bribery.

In addition, the jury was improperly instructed that it could find Mr. Busby guilty of Count 1 (conspiracy) if it found that Mr. Busby "conspired to have an agent of an organization . . . obtain by fraud property . . . of a governmental entity." ECF 153 at 16. The jury should have never received this instruction because the Superseding Indictment was completely devoid of any allegation that Mr. Busby conspired to obtain property by fraud. And the government failed to present evidence that Mr. Busby conspired to commit fraud.

The wire fraud counts (Counts 14–24) allege that Mr. Hutchison committed wire fraud by overcharging HISD for mulch and charging for more grass cutting than his company performed, but the Superseding Indictment does not allege anywhere that Mr. Busby participated in or even know about this alleged fraud.

It was error for the jury to be instructed that they could convict Mr. Busby of conspiracy to commit fraud. The Superseding Indictment included the text of § 371(c) in Count 1 but contained no factual allegations that Mr. Busby conspired to commit wire fraud. An indictment must contain the "plain, concise, and definite written statement of the essential facts constituting

the offense charged[.]" FED. R. CRIM. P. 7(c)(1). The Superseding Indictment contained no facts constituting the offense charged in § 371(c).

During the charge conference, the Court asked the government what evidence supported the § 371(c) charge, and the government admitted that the "it basically says the same thing that the wire fraud counts say. It's about the mowing fraud." But Mr. Busby is not charged, or even mentioned, in the "mowing fraud" counts (Counts 14–17 and 23–24).[9] Thus, by the government's own admission, the Superseding Indictment contained to "written statement of the essential facts constituting the offense charged" against Mr. Busby. See FED. R. CRIM. P. 7(c)(1).

Similarly, at trial, there was no evidence that Mr. Busby participated in or knew about the alleged "mowing fraud" scheme. Yet the government argued that the § 371(c) charge should be included in the Jury Instructions on the basis that Mr. Busby's stamped signature appeared on mowing invoices. But the government presented no evidence that Mr. Busby directly oversaw the mowing or was ever responsible for verifying that the invoices were accurate. See Day 14 pm Tr. at 52:23–53:8. The Court instructed the jury in accordance with the government's request. Neither the allegations in the Superseding Indictment nor the evidence presented at trial can support the § 371(c) charge against Mr. Busby, so it was error for the jury to be instructed that they could find

---

[9] The government also failed to present evidence that the alleged wires (emails) traveled across state lines. The only evidence the government presented to prove interstate commerce—a core jurisdictional element of § 1343 wire fraud—was the testimony of an IRS Special Agent who said he received a letter from Google stating that Google did not have servers in Texas between June 1, 2017, and July 29, 2019. See Day 13 am Tr. at 118:20–120:19; GEX 997. The agent also testified that based on his two-year "experience working as a network administrator" (presumably, in 2005–2007), the emails sent in 2017–2019 would have gone to a Google server outside of Texas. See id. at 116:14–24. No competent evidence was presented regarding how emails travel from one email address to another on the alleged dates (2017–2019). The evidence was insufficient to establish that the emails at issue—which were sent and received in Houston—ever left the State of Texas. And, therefore, the government failed to prove the wire fraud counts that formed the basis of § 371(c).

Mr. Busby guilty of § 371(c). When the jury instructions allow the jury to convict on an improper basis, the conviction must be vacated. *See, e.g.*, *Skilling*, 561 U.S. at 413.

Because the Jury Instructions allowed the jury to find Mr. Busby guilty of Count 1 on an improper basis and Verdict Form did not require the jury to identify the basis of its verdict, the verdict on Count 1 must be vacated.

### C.  The Court should vacate Mr. Busby's witness tampering conviction (Count 26).

Count 26 alleged that Mr. Busby engaged in witness tampering through two specific statements. The government, however, failed to present any evidence that Mr. Busby made either of those two statements, much less engaged in witness tampering based on those statements. Instead, the government urged the jury to convict Mr. Busby of witness tampering based on a substantively different statement not alleged in the Superseding Indictment. The complete lack of any evidence at trial that Mr. Busby made the statements alleged in Count 26 requires a judgment of acquittal on Count 26.

#### 1.  The government was required to prove the facts alleged to violate 18 U.S.C. § 1512(b)(3).

The government presented no evidence at trial that Mr. Busby made the statements alleged in Count 26 or that he acted with the purpose and intent alleged in Count 26. Rather than prove the allegations in the Superseding Indictment, the government explicitly asked the jury to convict Mr. Busby for making a different statement with a different alleged purpose. This constitutes an impermissible constructive amendment. The verdict must be vacated and an order of acquittal entered on Count 26. *See, e.g.*, *Reasor*, 418 F.3d at 475, *Chambers*, 408 F.3d at 237, *Adams*, 778 F.2d at 1123, *Salinas*, 601 F.2d at 1287, *Salinas*, 654 F.2d at 324, *Doucet*, 994 F.2d at 172, *Nunez*, 180 F.3d at 227.

### 2. The government presented no evidence that Mr. Busby made the statements alleged in Count 26.

The government did not present any evidence to support the allegations in Count 26. Therefore, no reasonable jury could find beyond a reasonable doubt that Mr. Busby was guilty of Count 26. The Superseding Indictment alleged that Mr. Busby engaged in witness tampering through two specific statements. Specifically, it alleged that:

> Brian Busby, Defendant herein, did knowingly attempt to corruptly persuade Hoskins to falsely state *to investigators* that [1] BUSBY did not direct anyone *to use any specific contract vendors* [, and] . . . [2] BUSBY did not personally conduct project "walk-throughs" with contract vendors (part of the purchase order award process) . . . .

ECF 42 at ¶ 68 (emphasis added). The government conceded that it did not present any evidence regarding any statement about "walk-throughs," so that allegation was not presented to the jury in the Jury Instructions. Despite the government not presenting any evidence that Mr. Busby ever said anything to Hoskins about "direct[ing] anyone to use any specific contract vendors" as alleged in the Superseding Indictment, this portion of Count 26 was submitted to the jury.

The relevant part of the jury instruction read:

> For you to find the defendant, Brian Busby, guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
>
> *First:* That the defendant, Brian Busby, attempted to *corruptly* persuade Alfred Hoskins to falsely state *to investigators* that Brian Busby did not direct anyone *to use any specific contract vendors*; . . . .
>
> An act is done "corruptly" if the defendant acted knowingly and *dishonestly* with the specific intent to subvert or undermine the due administration of justice.

ECF 153 at 26–27 (emphasis added). The jury should never have been asked to decide Count 26. The government did not present any evidence that Mr. Busby directed any statement at the *target* alleged in the Superseding Indictment (*i.e.*, "investigators"), nor did the government present

evidence that Mr. Busby made a statement regarding the *subject matter* alleged in the Superseding Indictment (*i.e.*, "direct[ing] anyone to use any specific contract vendors."). *See* ECF 42 at ⁋ 68.

First, the government presented no evidence that Mr. Busby attempted to persuade Mr. Hoskins to say anything at all to the alleged *target* of the statement: "*investigators*." The evidence was that Mr. Busby asked Mr. Hoskins to tell "the guys" that Mr. Busby had nothing to do with Just Constructing "getting a contract." But "the guys" were not "investigators." To the contrary, Mr. Hoskins explicitly clarified that when Mr. Busby said, "the guys," he understood Mr. Busby was referring to "Luis -- I mean, the guy that was on the RFP evaluation list." The evidence at trial was accordingly devoid of any evidence supporting the allegation that Mr. Busby told Mr. Hoskins to tell *investigators* anything.

Second, the government did not present any evidence that Mr. Busby attempted to persuade Mr. Hoskins to state that Mr. Busby did not direct anyone to "use any specific contract vendors"—the *subject matter* of the alleged statement. Instead, Mr. Hoskins testified that Mr. Busby told him to let Luis know that Mr. Busby did not have anything to do with Just Construction "getting a contract"—a completely different process.

A side-by-side comparison of the Superseding Indictment allegations and the evidence presented at trial demonstrates that the government failed to present any evidence that Mr. Busby made the statements alleged in the Superseding Indictment.

| Superseding Indictment Allegation | Trial Evidence<br>Testimony of Alfred Hoskins |
|---|---|
| Brian Busby "did knowingly attempt to corruptly persuade Hoskins" (ECF 42 at ¶ 68) | Q. Okay. What -- what did he say? |
| "to falsely state to *investigators*" (*id.*) | A. He called me back this time, and he said, "Bro, be sure to let *the guys* know . . . ."<br><br>Q. When he said "*the guys*," what did you understand that to mean?<br><br>A. *Luis – I mean, the guy that was on the RFP evaluation list.* |
| "that BUSBY did not direct anyone *to use any specific contract vendors*" (*id.*) | "Bro, be sure to let the guys know that I didn't have anything to do *with Just Construction getting a contract or anything*. I had nothing to do with none of that." |
| "when in reality BUSBY *directed his subordinates to use HUTCHISON's companies*" (*id.*) | "Q. And did you agree with that statement, that he had nothing to do with *the award of that contract* to Just Construction?<br><br>A. No, sir. He – no, sir.<br><br>Q. Okay. Why not?<br><br>A. No, sir, because *he basically told me to make sure that they get the contract*." |

Day 4 pm Tr. at 143:3–19.

There is obviously a significant substantive difference between *Luis, the guy on the RFP evaluation list*, and *investigators*.

There is also a significant substantive difference between the decision to "use any specific contract vendors" (the alleged statement in Count 26) versus having something to do with a vendor "getting a contract" (not alleged statement). Eugene Salazar, a senior manager in the Facilities, Maintenance, and Operations (FMO) Group for HISD, explained this important distinction.

> Q. And so what -- if something breaks, what do they do? Do they -- do they fix it? Do they buy a new one?
> A. It depends on what -- what the issue is. They generally will try to repair it with in-house staff or maintenance technicians, but if it's something

that's beyond repair or beyond their capacity to repair, we'll contract
that service out.

Q. Okay. And so what type of vendors will they contract with?

A. The district has several, but **we have annual vendors that are
available for minor maintenance** is one of the -- one of the vendors'
groups that we do have available for that.

Q. Okay. And have you heard of a company called Just Construction?

A. Yes, sir.

Q. What kind of service did Just Construction provide to the district?

A. I believe they were in a minor maintenance contract.

Day 9 am Tr. at 127:12–128:3 (emphasis added).

Q. Okay. So if you're an **annual vendor**, and let's say you're in the
maintenance side, they can call you and hire you for jobs, but **you're
not necessarily going to get a job**; is that fair?

A. That's correct.

Q. **You may get a job, but you may not.**

A. **That's right.**

Q. But if you're an approved vendor, then you're going to be getting work;
is that fair?

A. I wouldn't explain it that way. I guess **if you're an approved vendor,
that means you've cleared the first hurdle**. You have the authority to
do business with the district. We can issue you a purchase order. **That
means we can ask you to do something**, we give you a purchase order,
you do the work, and you get paid for it.

Day 9 pm Tr. at 29:11–30:11 (emphasis added). As Mr. Salazar explained, "getting a contract"

just means that a vendor has "cleared the first hurdle" to become eligible to get work. *Id.* But

"us[ing] any specific contract vendor[]" (that is, a vendor who already has a contract) means

actually giving a vendor a purchase order so that the vendor can do work and get paid. *See id.*

Simply "getting a contract" did not mean that Just Construction would get any work. *See*

Day 5 am Tr. at 94:13–23. Just Construction was not the only contract vendor. Mr. Hoskins

testified that two other vendors were approved that year to be minor maintenance annual vendors.

*See* Day 4 pm Tr. at 123:7–9.

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 57**

In sum, there was no evidence whatsoever that Mr. Busby told Mr. Hoskins to tell *investigators* that Mr. Busby did not "direct anyone *to use any specific contract vendors*" as alleged in Count 26. ECF 42 at ¶ 68 (emphasis added).

### 3.    The evidence was insufficient for any reasonable jury to conclude that Mr. Busby acted "corruptly."

The evidence presented not only concerned a different target and a different subject matter than the Superseding Indictment alleged, but it was also incurably contradictory. The government called Mr. Hoskins to try to prove that Mr. Busby engaged in witness tampering. Mr. Hoskins' testimony was the only evidence presented to support Count 26.

When first asked by the government if Mr. Busby was involved in awarding a contract to Just Construction, Mr. Hoskins told the government that Mr. Busby was involved. *See* Day 4 pm Tr. at 143:11–19 (stating that Mr. Busby "basically told me to make sure that they get the contract"). Mr. Hoskins then testified on cross-examination that Mr. Busby was not involved in awarding a contract to Just Construction. *Id.* at 163:17–23 ("Q: So when he said to you, 'I didn't have anything to do with the award' . . . 'Tell the guys I didn't have anything to do with the award'? . . . That was the truth, wasn't it? A: Yes, it's the truth. He didn't pick nobody."). In other words, Mr. Hoskins responded both "yes" and "no." The government never even tried to reconcile this directly contradictory testimony. Based on this directly conflicting testimony, no reasonable jury could find beyond a reasonable doubt that Mr. Busby acted "corruptly." *See United States v. Yi*, 460 F.3d 623, 631 (5th Cir. 2006) (vacating defendant's conviction where "no rational jury could have found *beyond a reasonable doubt*" that the defendant trafficked certain counterfeit goods due to "weak and attenuated circumstantial evidence").

### 4. The government's closing argument constructively amended the Superseding Indictment and misstated the evidence.

The government materially misstated the evidence and the Superseding Indictment allegation in its closing argument. Apparently recognizing that it had not presented *any* evidence at trial to support the actual allegations in Count 26, the government instead attempted to convince the jury that it could convict Mr. Busby of witness tampering based on a statement never alleged in the Superseding Indictment. The government's statements were improper and cast serious doubt on the correctness of the jury's verdict. In its closing, the government argued:

> But in the meantime and after that search, you heard testimony from Mr. Hoskins where he told you that Mr. Busby called him. And why did Mr. Busby call him? Mr. Hoskins testified . . . he said, "Bro, be sure to let the guys know that I didn't have anything to do with Just Construction getting a contract or anything. I had nothing to do with none of that."

> Then Mr. Johnson asks, "When he says 'the guys,' what did you understand that to mean?" And he said, "Luis, the guys that were on the RFP evaluation list."

> Mr. Busby called him directly to tell him, **"Make sure that you don't tell them, the FBI, that I was in any way part of getting that contract awarded."**

> And Mr. Hoskins was asked, "Did you agree with the statement that he had nothing to do with the award of that contract of Just Construction?"

> "No, sir. He -- no, sir.

> "Okay. Why not?

> "No, sir, because he basically told me to make sure that they get the contract," referring to Brian Busby.

> It was Brian Busby who told him during the time of the 2017 evaluation committee for Just Construction **to get the annual contract to do a boatload of work for HISD** after Hurricane Harvey. Mr. Busby calls him -- Mr. Hoskins -- and tells him, **"Don't tell them that I had anything to do with that**."

> Mr. Hoskins tells you, "**That's a lie**."

> **That's the basis of the witness tampering with respect to Brian Busby.**

Day 19 pm Tr. at 18:7–19:14 (emphasis added).

The government's argument misstated both the testimony and the charge in the Superseding Indictment. There was absolutely no evidence that Mr. Busby said anything to Mr. Hoskins about the FBI or any investigators.

Further, the government materially misstated and misled the jury about the actual charge against Mr. Busby. The government told the jury that the Superseding Indictment charged Mr. Busby with telling Mr. Hoskins to tell [Luis] that Mr. Busby did not have anything to do with Just Construction getting a contract. But that is not what Count 26 alleges. Count 26 alleges that Mr. Busby attempted "to corruptly persuade Hoskins to falsely state *to investigators* that BUSBY did not *direct anyone to use any specific contract vendors*." ECF 42 at ¶ 68. The government presented no evidence to support this charge.

Finally, the government materially misstated the evidence about what it meant to get an annual contract when it stated that "Brian Busby . . . told [Mr. Hoskins] during the time of the 2017 evaluation committee for Just Construction to get **the annual contract to do a boatload of work for HISD after Hurricane Harvey**." Day 19 pm Tr. at 19:6–9 (emphasis added). There was no such contract. "Getting a contract" meant becoming an annual vendor, which was only a first step to becoming eligible to receive work from HISD. The government's contrary claim that there was such thing as a "contract to do a boatload of work for HISD" was a material misstatement of the evidence. Combined with its misstatement of the charge in the Superseding Indictment, the government's improper remarks cast serious doubt on the correctness of the jury's verdict regarding Count 26. *See Reasor*, 418 F.3d at 475.

### D.  The Court should vacate Mr. Busby's tax fraud convictions (Counts 29–33).

No reasonable juror could conclude, based on the evidence presented at trial, that Mr. Busby committed tax fraud as alleged in Counts 29–33 of the Superseding Indictment. The

government's presented two theories of liability to the jury: (1) the "specific items" method of proof—evidence of specific amounts of reportable income that do not appear on the income tax return; and (2) the "expenditures" method of proof—evidence that the defendant spent more money than reported on his income tax return. *See* ECF 153 at 31.

The government failed to present sufficient evidence to establish either of these two theories. First, the government failed to establish an accurate opening balance. Second, the government failed to actually trace Mr. Busby's cash deposits. And third, the government failed to present any evidence to establish that any of the purported cash was taxable income.

### 1.  The government failed to establish an accurate opening balance.

In a tax fraud case, the government bears the "essential" burden to "establish an accurate cash on hand figure [or opening balance] for the beginning of each taxable year" with "reasonable certainty." *United States v. Boulet*, 577 F.2d 1165, 1169–70 (5th Cir. 1978) (quoting *United States v. Marshall*, 557 F.2d 527, 530 (5th Cir. 1977)). The government must also prove "that the receipts in question were taxable." *United States v. Adams*, 314 F. App'x 633, 645 (5th Cir. 2009) (per curiam) (unpublished); *see also Boulet*, 577 F.2d at 1169 ("If the taxpayer's deposits or expenditures during any taxable year came from a safety deposit box or a secret cache [or a gift], 'they are not 'income' when taken from their storage place and deposited in a checking account' or when spent." *Id.* (quoting *United States v. Frank*, 245 F.2d 284, 286 (3d Cir. 1957)); *Marshall*, 557 F.2d at 530 (holding that it is the government's burden to establish that "the expenditures in question were not made from other nontaxable sources, such as gifts, loans, or bequests" or "previously accumulated assets").

Because tax fraud cases generally rely on circumstantial evidence—whether the government tries its case under a net worth or specific item method—the Fifth Circuit requires the government to meet "well-established criteria" to protect defendants (like Mr. Busby) from

prosecutions "fraught with danger for the innocent." *Adams*, 314 F. App'x at 645 and n.40. Thus, in addition to the two *Boulet* burdens above, the government must also prove that it "performed an 'adequate investigation that did not disclose non-taxable sources.'" *Id.* at 645 (quoting *Boulet*, 577 F.2d at 1168). The investigation must establish "a guarantee of essential accuracy in the circumstantial proof at trial as an element of the government's burden of proving guilt beyond a reasonable doubt." *Id.* at 645–46 (quoting *Boulet*, 577 F.2d at 1168). If the government did not adequately investigate, then the case should be deemed "insufficient to go to the jury." *Holland v. United States*, 348 U.S. 121, 136 (1954).

In keeping with the government's investigative burden, it is well-settled that the government cannot rely on uncorroborated extrajudicial statements concerning a defendant's financial history to convict a defendant of tax fraud. *See, e.g.*, *Smith v. United States*, 348 U.S. 147, 157 (1954) (requiring the government to corroborate a net worth statement the defendant signed); *United States v. Calderon*, 348 U.S. 160, 165 (1954) (holding that tax returns obtained from the defendant "can hardly give rise to an inference that defendant had no more cash at the starting date than the Government gave him credit for"). When the government relies on an extrajudicial statement—*such as a mortgage application*—to establish a defendant's opening cash balance, it bears the burden to corroborate the application by independently investigating the defendant's financial history. *See Calderon*, 348 U.S. at 165; *Vloutis v. United States*, 219 F.2d 782, 791 (5th Cir. 1955) (holding that, under *Smith* and *Calderon*, any "statements by the accused used in the prosecution [of tax evasion] must be corroborated").

Here, the government relied on two documents to argue that Mr. Busby committed tax fraud: (1) a 2014 mortgage application that did not list (and did not have to list) all of Mr. Busby's or his family's assets; and (2) GEX 1, an unauthenticated "ledger" that the government claimed

was evidence of Mr. Busby receiving payments from Mr. Hutchison. Neither document was remotely sufficient to convict Mr. Busby under the government's "essential" burden. *Boulet*, 577 F.2d at 1169.

First, before even considering the government's "evidence," the Court should vacate Mr. Busby's convictions under 26 U.S.C. § 7206 because the government improperly elicited testimony from an FBI agent who told the jury that Mr. Busby's 2014 mortgage application listed *all* of Mr. Busby's assets and that if Mr. Busby did not list *all* of his assets, then he committed a crime:

> Q. Okay. In evaluating whether to make a loan to someone, what type information does the bank take into account?
> A. I think they would take into -- they take into account the person's ability to pay, which includes their net worth as of the time of the loan, which is included in this calculation.
> Q. Okay. **And if you lie on a federal -- on a loan application, do you know if that's a crime**?
> A. **Yes, sir, it is.**
> Q. And here, Mr. Busby lists total assets of $422,000; right?
> A. Yes, sir.
> Q. And then does he initial the bottom page, bottom of the page?
> A. He does.
> Q. And so what are you using his statement of total assets of $422,000 to do?
> A. **I'm using that to say -- or to determine that there are no other assets besides the assets that he's presented to the bank to obtain this loan.**
> Q. All right. So in other words, if he had a million dollars under his bed, is it reflected in this document?
> A. It is not reflected in this document.

Day 13 pm Tr. at 86:2–88:11 (emphasis added). This questioning was improper and highly prejudicial because a government agent (incorrectly) told the jury not only what constitutes a crime, but that if Mr. Busby did not list an asset on his mortgage application, he committed a separate federal crime. It is indisputable, however, that federal law enforcement agents may not instruct the jury on the law. *See United States v. Rothenberg*, 328 F. App'x 897, 902 (5th Cir. 2009) (holding that "opinion testimony about 'what the law is' . . . is impermissible" (quoting

*United States v. Griffin*, 324 F.3d 330, 347–48 (5th Cir. 2003)); *United States v. Okoroji*, No. 3:15-CR-00559-O, 2018 WL 8756434, at *1 (N.D. Tex. June 12, 2018) (finding that the law "forbids an expert from instructing the jury on the law" and an expert "may not conclude that a defendant violated the law" (collecting cases)).

The agent's statement of the law to the jury was wrong. While it may be a crime to materially misstate one's *liabilities* under certain circumstances, it certainly is not a crime to understate one's *assets* in a mortgage application. People do this all the time for a variety of legitimate reasons. If one's income without any assets is sufficient to obtain a loan, a person may simply not list any other assets on the loan application. Or, as is more often the case, one's income combined with some easily verifiable assets (such as savings or retirement accounts) are sufficient for the person to get the loan, a person may leave off assets that are more difficult to value or verify (such as cash, jewelry, or livestock). Indeed, including assets that are more difficult to value or verify may needlessly slow down the processing of a mortgage application, which typically must be processed in a short window of time between agreeing to purchase a house and closing on that house.

And aside from these practical realities, lenders and financial institutions do not expect to receive a treatise on each applicant's assets in a mortgage application. As financial institutions and mortgage lenders state, "assets do not weigh as heavily as credit and income in terms of lending criteria."[10] It is simply not a crime to leave assets off of a mortgage application, and it was both

---

[10] Mike Ogg, *What do Mortgage Lenders Look At?*, Rock Mortgage – Houston, Texas (last accessed Sept. 16, 2025), available at https://www.rockmtg.com/blog/what-do-mortgage-lenders-look-at/#:~:text=Although%20assets%20don%27t%20weigh,other%20investments%20you%27ve%20made.

false and highly prejudicial for the government to elicit testimony from the FBI agent that it is a crime to not list all assets on a mortgage application.

Second, the government fell well-short of meeting its burden under *Boulet*. The government relied on a June 2014 mortgage application (even though the earliest tax charge was for tax-year 2015 beginning January 1, 2015) and GEX 1 (handwritten notes discovered at Mr. Hutchinson's home) to convict Mr. Busby of tax fraud. But the Fifth Circuit requires far more. A review of three leading cases where the Fifth Circuit affirmed a tax fraud conviction illustrates that Mr. Busby's case is a reversible outlier—the evidentiary gap is drastic.

In *Marshall*, the Fifth Circuit affirmed the defendant's conviction where the government proved the defendant's opening available funds after it investigated and offered evidence of its "survey of some 60 banking and financial institutions . . . as well as interviews of Marshall's family and friends." *Marshall*, 557 F.2d at 530. The government also "showed that the investigation of Marshall's affairs disclosed no corroborating evidence of the cash hoard" that the defendant relied on for his defense. *Id.*

Similarly, in *Boulet*, the Fifth Circuit affirmed the defendant's conviction after holding that the government thoroughly investigated the defendant's bank records, purchase of savings bonds and interest-bearing bank certificates of deposit, and habit of withdrawing and stashing cash in a safety deposit box for years. *Boulet*, 577 F.2d at 1169–70. The government credited the defendant "with having $15,000 on hand" and "investigated all 'leads,'" leading the Fifth Circuit to hold that the evidence was "sufficient to go to the jury" as it "satisfied the standard of reasonable certainty[.]" *Id.* at 1170.

And in *Adams*, the Fifth Circuit held that the government met its burden because it conducted a three year tracing analysis, "reconstructed Adams's cash-flow for the several years

leading up to the tax year covered by his 2000 tax return," "followed relevant leads to the extent possible," and investigated for non-taxable income sources, which included "searching for non-taxable income sources such as loans, gifts, and inheritances" by reviewing "Adams's check registers, deposit slips, and other bank documents[.]" 314 F. App'x at 647–48.

Here, the government offered an uncorroborated *2014* mortgage application and GEX 1, an unauthenticated handwritten document discovered at a co-defendant's home that the government admitted was not an accurate record of payments to individuals.

The divergence between what the Fifth Circuit has deemed "reasonable certainty" under *Marshall*, *Boulet*, and *Adams*, versus what the government offered here cannot be overstated. In each of the above cases, the Fifth Circuit was concerned with whether the government corroborated evidence and followed the Fifth Circuit's "well-established criteria" for tax fraud cases. *See Marshall*, 557 F.2d at 530; *Boulet*, 577 F.2d at 1169–70; *Adams*, 314 F. App'x at 647–48. But here, the government did not engage in a tracing analysis, review the records from every relevant financial institution, interview family and friends, consider investments, bond purchases, non-taxable income sources, gifts, or follow every possible lead. Instead, the government used an FBI agent to say Mr. Busby's mortgage application was sufficient proof of Mr. Busby's opening balance without more. *See* Day 13 pm Tr. at 86:2–88:11.

Under Fifth Circuit law, this complete lack of corroboration cannot stand. And for good reason. The Fifth Circuit recognized in *Vloutis* that absent corroboration, there is a significant danger that the government can try to bind a defendant to prior financial statements that the defendant never intended to be bound by. *Vloutis*, 219 F.2d at 791. It is for this critical reason that corroboration is necessary. A prior statement regarding a defendant's finances, such as a mortgage application, may only be part of the picture. Without independent corroboration, though, the

government is given the prejudicial liberty to misrepresent the prior statement as the defendant's statement concerning his entire financial picture. The government can then claim that the defendant consented to be bound by that statement as a ***complete*** statement when he did no such thing. This is particularly true for a mortgage application, which does not require a full disclosure of assets—like it does for liabilities—but simply a truthful disclosure of enough assets to secure a loan. *See supra* note 10. Accordingly, using Mr. Busby's 2014 mortgage application by itself, without any corroboration, to determine his opening balance is reversible error that necessitates the vacatur of his conviction. *Boulet*, 577 F.2d at 1169.

### 2.   The government failed to trace cash deposits.

Similarly, the government failed to trace cash deposits. An FBI analyst testified as to the total amount of cash deposits in Mr. Busby's bank accounts. She testified that she only looked at cash deposits and did not even try to determine the source of the cash. Day 19 am Tr. at 78:5-14. She testified that she did not "identif[y] which deposits of cash were from loans to Mr. Busby." *Id.* at 76:3–5. She was unable to identify redeposits of cash coming from withdrawals from known accounts. *Id.* at 74:19–24. She was not aware of Mr. Busby's "retirement withdrawals that resulted in redeposits." *Id.* at 78:2–5. This is a far cry from the adequate investigation required before someone can be convicted of tax fraud.

As for GEX 1, the government failed to establish that Mr. Busby received any payments of the dollar amounts listed in the ledger. The government argued that every dollar amount listed next to "BB," and even amounts listed where no "BB" appeared anywhere on the page, was a cash payment that should have been recorded as income on Mr. Busby's tax return. Yet FBI forensic accountant Kathryn Prado testified that she could not match any cash deposits in Mr. Busby's bank accounts with the amounts recorded on GEX 1. *Id.* at 81:9–12. And numerous witnesses, as explained in Section A, testified that GEX 1 was inaccurate on dates, times, places, and payments.

### 3. The government failed to present any evidence that the cash deposits were taxable income.

The government also failed to establish that any of the cash deposits were reportable income. Even if Mr. Busby received cash from Mr. Hutchison, which the government never proved, the government certainly did not prove that any such alleged payments constituted *income* rather than *gifts*.

Gifts are not income and should not be included as income on a tax return. *See* Internal Revenue Service, *Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return* (last accessed Sept. 13, 2025), https://www.irs.gov/pub/irs-pdf/f709.pdf (requiring only the giver of the gift to file a tax return if a gift exceeds the annual gift tax exclusion). The lifetime gift and estate tax exemption—$11.4 million per individual, and $22.8 million for a married couple in 2019 (Count 33)—shields most gifts from taxation, even if a return is required. Thus, it is not tax fraud to not include gifts as income on a tax return. *See id.*; *Marshall*, 557 F.2d at 530.

Finally, the government has the burden of proving that any payment Mr. Busby allegedly received from Mr. Hutchison was income rather than a gift. The government did not, and could not, meet that burden as Mr. Busby did not work for Mr. Hutchison in any capacity. Moreover, the government's own cooperating witnesses testified that the payments they received from Mr. Hutchison were gifts, and the government did not charge them with tax fraud. *See, e.g.*, Day 4 am TR. at 62:2–5 (testimony of Luis Tovar: "Q: Did you pay taxes on that $10,000? A: No. Q: Okay. Because you considered it a gift; is that right? A: Yes."); Day 5 am Tr. at 119:23–24, ("Q: This was a gift, right? That's what you thought it was? A: Yes, sir. Yes, sir.").

The government failed to establish that Mr. Busby received any money that should have been included as income on his tax returns. Therefore, no reasonable juror could find beyond a reasonable doubt that Mr. Busby committed tax fraud as alleged in Counts 29 through 33.

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 68**

### E. The Superseding Indictment should be dismissed because the government knowingly presented false, material information to the Grand Jury.

The Superseding Indictment should be dismissed because the government knowingly presented false, material information about GEX 1 to the grand jury, which undoubtedly influenced the grand jury's decision to indict Mr. Busby. Specifically, the government presented testimony from an FBI Special Agent that the handwritten ledger found at Mr. Hutchison's house—the same document identified as GEX 1 at trial—was a "bribe ledger." The government then told the grand jury that the government had "witnesses that corroborate the bribe ledger." This was false. Not a single government witnesses corroborated the document as a "bribe ledger." Instead, every single witness told the government that the purported "bribe ledger" did *not* accurately reflect payments—not the number, amount, location, or date of payments.

### 1. An FBI Special Agent testified that GEX 1 is a bribe ledger.

The government presented the following testimony to the grand jury:

> Q: All right. Now, was there one item in particular that you found during this search that proved to be particularly important?
> A: Yes.
> Q: What is that?
> A: That's the bribe ledger.
> Q: So tell us what the bribe ledger is.
> A: The bribe ledger is a -- essentially a day planner that we found in Hutchison's residence. And in it, there's a couple of pages that tracks payments and invoices and folks that received the bribes.
> Q: Okay. So this bribe ledger, you're saying it was basically in one of those Daytimer calendars?
> A: Yes.
> Q: And these were entries handwritten into that Daytimer?
> A: Yes.
> Q: And these entries track bribe payments to various individuals at HISD?
> A: Yes.

Exhibit 1, Grand Jury Testimony 12/14/2021 at 23:18–24:12.

> Q: All right. Now, as part of the investigation, were you able to interview the individuals whose initials are listed on the left-hand side of the bribe ledger?

A: I interviewed everyone except Brian Busby.

Q: So you interviewed Alfred Hoskins, Gerron Hall, Luis Tovar, Derrick Sanders, and Rhonda Skillern-Jones?

A: I did.

Q: And did they all confess to receiving bribes from Anthony Busby (sic)?

A: They have all confessed.

Q: Did you show some of them the bribe ledger?

A: I did.

Q: Okay. And did they confirm that the bribe ledger accurately, for the most part, states when and where they received bribes?

A: Yes.

Q: Okay. So they confirmed this is, in fact, a bribe ledger?

A: Yes.

Q: Okay. And that they did, in fact, receive bribes according to the bribe ledger?

A: Yes.

*Id.* at 32:2–32:24.

The agent then told the grand jury what various entries in the document meant without any

support.

Q. And so in the left-hand column are a series of letters?

A. Yes, sir.

Q. And what do those letters correspond to?

A. The name of the – the first initial of the name, the payee.

Q. Of the person who received the bribe payment?

A. Yes, sir.

…

Q. And if you down the ledger, there's an "A" about five or six entries down. Do you see that?

A. Yes, that's an "A."

Q. Okay. What does "A" correspond to?

A. Alfred Hoskins.

Q. So these are the first initials of each of the bribe recipient's first name?

A. Yes.

*Id.* at 27:9–28:12.

> ### 2. The agent told the grand jury that several witnesses confirmed that GEX 1 was an accurate bribe ledger when they did not.

> #### a. Alfred Hoskins

The government told the grand jury that Alfred Hoskins confirmed that the ledger accurately reflected the payments he received, but that was not true.

> Q: And you showed Hoskins the bribe ledger, and he confirmed that he was getting paid at those dates and times as indicated in the ledger?
> A: Yes.

*Id.* at 39:4–39:7. The government knew that this was not true. Mr. Hoskins testified that he never looked at the ledger, and despite conducting multiple interviews of Mr. Hoskins prior to the grand jury presentation, the FBI never once documented that Mr. Hoskins confirmed that the ledger was accurate. On April 24, 2021, the FBI recorded the following in an FBI 302: "Hoskins was provided with a 'kickback ledger' for review. Hoskins *reviewed the kickback ledger and acknowledged the information on the ledger*. Exhibit 3, FBI 302 4/24/2021 at 2 (emphasis added). "Acknowledging" information in a document is substantially different from "confirming" information in a document. And Mr. Hoskins testified at trial that he never reviewed the "kickback ledger" in that meeting with the FBI at his house.

> MR. HARDIN: Could you put Government 1 up? Yeah. Thank you very much.
> Q. All right. Did they show you this?
> A. No. They had it on the table.
> Q. Uh-huh.
> A. And I think when I was -- I can't think. I was reaching at it, but the agent said something about it was -- if I – I didn't -- I didn't officially look.
> Q. Why? Were you afraid to, or what?
> A. Well, I'm trying to -- was I afraid? I was -- I guess I didn't want to get questioned about it neither.

Day 5 am Tr. at 31:23–32:9 (discussing the April 24, 2021 FBI interview). When asked about the document at trial, he vehemently denied "that he was getting paid at those dates and times as

indicated in the ledger." *See id.* at 122:9–20. Therefore, the government presented to the grand jury information that it knew was false.

### b.  Gerron Hall

Similarly, the government told the grand jury that Gerron Hall confirmed that he received the payments set out in the ledger, but that was not true.

> Q:  Back to Gerron Hall. Did you show Gerron Hall the bribe ledger?
> A:  I did.
> Q:  And did he confirm that the payments that he received basically were in agreement with – as set out in the bribe ledger?
> A:  Yes, he confirmed that.

Exhibit 1, Grand Jury Testimony 12/14/2021 at 42:9–42:15. The government knew that this information was false. On both April 24, 2021, and June 14, 2021, Mr. Hall told the government that he did not receive payments in the amounts listed in the ledger. *See* Exhibit 4, FBI 302 4/24/2021 ("Hall was provided with a 'kickback ledger' for review. Hall reviewed the kickback ledger and advised the dates in the ledger were correct; however, the amount was not correct. Hall stated he did not receive a payment of $10,000 or more at any time from Hutchison."). The FBI Special Agent who testified in the grand jury also wrote the report documenting Mr. Hall's interview. That agent wrote:

> Hall reviewed the kickback ledger and advised that the alleged kickback he received from 7/2017 to 1/2018 for the total amount of $57,500 was **inaccurate. Hall contested the payment amount** but not the locations of the payments. Hall explained **he did not receive $20,000** from Hutchison on 01/11/2018 because **the most he ever received from Hutchison at one time was $8,000.**

Exhibit 5, FBI 302 6/14/2021 (emphasis added).

### c.  Derrick Sanders

The government also told the grand jury that Derrick Sanders corroborated the bribe ledger.

> Q.  Then did you interview – did you show Derrick Sanders the bribe ledger?

A.  I did.
Q.  Did he confirm that the payments as indicated on the bribe ledger were,
for the most part, correct?
A.  Yes.

Exhibit 1, Grand Jury Testimony 12/14/2021 at 43:20–44:25. Once again, the government knew

that this information was false. Even though the government interviewed Derrick Sanders on

August 19, 2021, the government did not document that it ever even showed GEX 1 to Mr.

Sanders, much less that Mr. Sanders corroborated it. *See* Exhibit 8, FBI 302 8/19/21. Mr. Sanders

testified at trial that he thought the dollar amount in his plea agreement was changed because the

number in the plea agreement—derived from GEX 1—was not accurate. Day 2 pm Tr. at 166:11–

167:16. Further, Mr. Sanders said that he did not know if the dates listed in the ledger were dates

he received payments. *Id.*

### d.  Rhonda Skillern-Jones

Rhonda Skillern-Jones told the government that GEX 1 did not accurately reflect payments

she received, but the agent testified to the grand jury that Ms. Skillern-Jones told the government

that she "did, in fact, receive bribes according to the bribe ledger." *Compare* Exhibit 1, Grand Jury

Testimony 12/14/2021 at 32:2–32:24, *with* Exhibit 6, FBI 302 5/19/2021("Skillern-Jones reviewed

the Kickback Ledger provided by the interviewing agent and stated that she did not receive

$10,000.00 on two separate occasions from Hutchison. . . . Skillern-Jones did not meet Hutchison

at Trulucks Restaurant. . . . Skillern-Jones stated she did not receive $20,000 from Hutchison as

alleged in the Kickback Ledger."). Again, the agent who testified to the grand jury that Ms.

Skillern-Jones had corroborated GEX 1 co-authored the report documenting Ms. Skillern-Jones'

denial that GEX 1 accurately reflected payments from Mr. Hutchison.

### e. Luis Tovar

Similarly, Luis Tovar did not corroborate GEX 1, but the government told the grand jury that he did. Instead of corroborating GEX 1, Tovar told the government that he received payment amounts that were inconsistent with the amounts listed in the ledger. *Compare* Exhibit 7, FBI 302 5/18/2021 (Mr. Tovar listing payments of $10,000 in August 2017 at McCarty Street HAZMAT building; $7,000 on date unknown at Hilliar Elementary School; $3,000 on date unknown at Marshall Middle School), *with* GEX 1 (listing no payment amounts next to initial "L," which the government argued referred to Luis Tovar). Tovar did not "in fact, receive bribes *according to the bribe ledger*" as the agent told the grand jury. Exhibit 1, Grand Jury Testimony 12/14/2021 at 32:2–32:24 (emphasis added).

### 3. The government's presentation of false information to the grand jury influenced the grand jury and significantly prejudiced Mr. Busby.

The false information the government presented to the grand jury about GEX 1 was undoubtedly material. Although not a single witness told the government that GEX 1 accurately listed payments received, the government nonetheless told the grand jury that "Alfred Hoskins, Gerron Hall, Luis Tovar, Derrick Sanders, and Rhonda Skillern-Jones" all "confirmed this is, in fact, a bribe ledger" and that "they did, in fact, receive bribes according to the bribe ledger." Grand Jury Testimony 12/14/2021 at 32:2–32:24. And the issuance of the Superseding Indictment shows that the grand jury believed the government's false statements.

The Superseding Indictment described GEX 1 as follows:

> In 2017, HUTCHISON maintained a bribe ledger in which he tracked the bribe payments he made in exchange for assistance with securing particular purchase orders. In the ledger, HUTCHISON typically listed the HISD schools where his companies Southwest Wholesale or Just Construction did construction, repair, grounds maintenance, or landscaping work, the type of work, the amount of the invoice paid by HISD for the work, the amount of the bribe that he paid, the identity of the bribe recipient (identified by initials or first name), the date the bribe was

> paid, and, at times, the location at which the bribe was paid, such as at local restaurants or schools or while on trips to Las Vegas with the bribe recipients.

ECF 42 at ¶ 15. The grand jury accepted the government's representations as true without any knowledge or way of knowing that the government's cooperating witnesses directly contradicted the government's representations.

The jury never heard, despite the government's knowledge of the testimony, that the government's cooperating witnesses had already identified significant discrepancies between the dollar amounts listed in GEX 1 and the payment amounts they received. For example, according to the FBI 302 documenting the government's interview of Gerron Hall on June 14, 2021, "Hall explained he did not receive $20,000 from Hutchison on 01/11/2018 because *the most he ever received from Hutchison at one time was $8,000*." Exhibit 5, FBI 302 6/14/21 at 3. But the government did not tell the grand jury that Hall denied receiving the amounts listed in GEX 1 even though *the agent who testified to the grand jury co-authored the FBI 302* documenting Hall's statement. The government nonetheless included in both the Indictment and the Superseding Indictment an overt act alleging that Hutchison paid Hall $10,000 on November 7, 2017 (ECF 42 at ¶ 35), $20,000 on December 12, 2017 (*id.* at ¶ 41); and $20,000 on January 11, 2018 (*id.* at ¶ 45).

The government knew that *none* of the specific witnesses the government said had corroborated the ledger in fact done so. Instead, the government's cooperators had: (1) explicitly denied that the ledger accurately listed payments to them (Gerron Hall and Rhonda Skillern-Jones); (2) provided information that was inconsistent with the amounts listed in the ledger (Luis Tovar); or (3) had not opined at all on the accuracy of the ledger (Alfred Hoskins and Derrick Sanders). Further, GEX 1 was the *only* evidence the government presented to support the bribery counts against Mr. Busby (Counts 8–13) and the alleged overt acts of payments to Mr. Busby (Count 1).

Q: Okay. The rest of the allegations in Paragraphs 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, and 38, are these all – do these all describe bribes that were paid to one of the various bribe recipients identified in the bribe ledger, and does the bribe ledger support the allegation as described in the indictment?
A: Yes; and, yes, it does.
Q: Okay. So all of these are bribes that come straight out of the bribe ledger?
A: Yes.
Q: Okay. And that's Government Exhibit 1?
A: Yes.
Q: And the ledger shows who's getting paid, how much they're getting paid, what projects at what schools they're getting paid for, and how much the bribe is?
A: Yes.
Q: And it also shows the date that they're getting paid?
A: Yes.
Q: And so the allegations in those paragraphs that I just listed, are they true and correct and supported by the evidence of the investigation?
A: Yes sir.

Exhibit 1, Grand Jury Testimony 12/14/2021 at 54:8–55:6.[11]

Q. The indictment, starting on page 6 through page 9, lists what are called overt acts of the conspiracy. And are -- to the extent these overt acts are alleging that bribes are being paid, are those bribes that appear in the bribe ledger that we just looked at?
A. Yes.
Q. And so all of the overt acts which are paragraphs 22 through 51 that involve cash bribes are reflected in that ledger we just took a look at?
A. Yes.

Exhibit 2, Grand Jury Testimony 4/7/2022 at 33:10–33:19.

Because GEX 1 was the only evidence the government presented to the grand jury to support the overt acts alleging payments (ECF 42 at ¶¶ 25, 27–45) and the bribery counts against Mr. Busby (Counts 8–13), the government repeatedly told the grand jury that GEX 1 was an

___

[11] During the April 7, 2022, presentation to the grand jury, the government presented the grand jury with Government Exhibit 15—the transcript of the FBI agent's December 14, 2021, testimony before the grand jury. *See* Exhibit 2, Grand Jury Testimony 4/7/2022 at 59:1–59:6 ("Also, there's Government's Exhibit 15, which is the transcript from December 14th, 2021, the previous time we presented this indictment to the Grand Jury. So if you wanted to review the previous transcript, you could. There's extra copies up here. But that's part of the official record.").

**BRIAN BUSBY'S MOTION FOR ACQUITTAL OR NEW TRIAL – PAGE 76**

accurate list of bribe payments corroborated by witnesses even though the government knew that was not true.

The Superseding Indictment should be dismissed because the government knowingly sponsored false, material information before the grand jury, and that information demonstrably influenced the grand jury's decision.

Due Process requires that the Superseding Indictment be dismissed even though the motion was raised post-verdict rather than pretrial. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 258–60 (1988) (holding that courts may dismiss indictments where constitutional error occurred during grand jury proceedings, the government was aware of the error, and the error could have influenced the grand jury's decision to indict); FED. R. CRIM. P. 12(c)(3) (stating that the Court may consider a motion that falls under Rule 12(b)(3) post-trial for good cause). There is good cause to dismiss the Superseding Indictment post-trial (and vacate Mr. Busby's convictions) given the severity of the due process violations.

### F.  The joint trial severely and unfairly prejudiced Mr. Busby.

The joint trial of Mr. Busby and Mr. Hutchison severely unfairly prejudiced Mr. Busby because: (1) the government introduced a substantial amount of highly inflammatory and prejudicial evidence that was irrelevant to the charges against Mr. Busby; (2) Mr. Hutchison's statements about Mr. Busby were presented to the jury in violation of the Confrontation Clause; and (3) Mr. Hutchison's defense and Mr. Busby's defense were contradictory.

A court may sever co-defendants' trials if joinder of the defendants in an indictment would result in prejudice. FED. R. CRIM. P. 8 and 14(a); *United States v. Marionneaux*, 514 F.2d 1244, 1248 (5th Cir. 1975) (explaining that under Rule 14, properly joined defendants "may obtain separate trials on a showing of prejudice"); *see also United States v. Merida*, 765 F.2d 1205, 1219 (5th Cir. 1985) ("The test for severance under Rule 14 is whether the jury could sort out the

evidence reasonably and view each defendant and the evidence relating to that defendant separately.").

Where a defendant has been convicted in a joint trial, reversal is "appropriate if there is clear evidence of prejudice resulting in an unfair trial." *United States v. Singh*, 261 F.3d 530, 533–34 (5th Cir. 2001). Prejudice results when there is a serious risk that a jury cannot make a reliable judgment regarding guilt or innocence. *See United States v. USPlabs, LLC*, No. 3:15-CR-496-L, 2018 WL 5831478, at *14 (N.D. Tex. Nov. 7, 2018) ("A defendant must show a 'specific compelling prejudice' resulting from joinder."); *see also United States v. McRae*, 702 F.3d 806, 822 (5th Cir. 2012).

The Fifth Circuit's test is whether the information presented to the jury *was irrelevant and highly inflammatory* such that a jury instruction could not remedy prejudicial spillover. When there is clear evidence of prejudice that results in an unfair trial, the Court must reverse. *See, e.g.*, *id.*; *Singh*, 261 F.3d at 533–34; *United States v. Cortinas*, 142 F.3d 242, 248 (5th Cir. 1998); *Marionneaux*, 514 F.2d at 1248; *Merida*, 765 F.2d at 1219. The spillover effect is "prejudice that may result from the introduction of evidence at trial relating to co-conspirators that is irrelevant to a particular defendant, such as evidence of the codefendants' other crimes or bad conduct." *Id.* at *17–18 (citations omitted).

Anticipating these issues, Mr. Busby moved for a severance pretrial, but the Court denied that motion. *See* Pre-Trial Tr. at 3:25–8:4. Mr. Busby's motion for severance should have been granted because the resulting joint trial significantly prejudiced Mr. Busby.

The government spent days presenting evidence related to: (1) Mr. Hutchison's significant "gambling problem," including the creation of fake Bulldog Timber invoices to hide Mr. Hutchison's payments of large gambling debts; (2) allegations that Mr. Hutchison defrauded HISD

by overcharging for playground mulch and overstating the number of times his company cut the grass each month; and (3) Mr. Hutchison going to strip clubs. This evidence was irrelevant and highly inflammatory, and therefore, the joint trial severely and unfairly prejudiced Mr. Busby.

      **1. Mr. Hutchison's "significant gambling problem" was inflammatory and irrelevant.**

Throughout the trial, the government presented evidence related to Mr. Hutchison's "gambling problem" and the lengths he went to pay his gambling debts. *See e.g.*, Day 18 Tr. at 29:3—31:15; Day 2 pm Tr. at 55:10—12; Day 4 pm Tr. at 32:19—20; *id.* at 146:9—10; Day 6 pm Tr. at 99:21—23; Day 12 am Tr. at 19:11—12; Day 12 pm Tr. at 93:16. This evidence, which was presented by multiple witnesses over multiple days, was completely irrelevant to Mr. Busby and was clearly prejudicial. *See Cortinas*, 142 F.3d at 248 (finding that testimony regarding the tactics and activities of a biker gang were highly inflammatory and prejudicial to certain defendants because they had no participation nor association with that biker gang's activities).

Ultimately, even though Mr. Hutchison's extensive gambling had nothing to do with the charges against Mr. Busby, evidence of Mr. Hutchison's "gambling problem" and related activities took an outsized role in Mr. Busby's trial. The prejudice was so significant that Mr. Busby's counsel was compelled to address it in closing argument even though Mr. Busby was not charged with any crimes related to gambling. *See* Day 19 pm Tr. at 82:16—22 ("[W]hether you think there's -- some things don't look right, whether you think that he shouldn't have been dealing with all that cash, **whether you think he shouldn't have been gambling** or not . . . ." (emphasis added)). This inflammatory, irrelevant evidence was highly prejudicial and was only presented at Mr. Busby's trial because Mr. Busby was tried jointly with Mr. Hutchison.

### 2. Evidence regarding the alleged wire fraud involving Kiddie Cushion and grass cutting should not have been presented at Mr. Busby's trial.

The government spent many days presenting evidence that Mr. Hutchison committed wire fraud by overcharging HISD for "Kiddie Cushion" playground mulch and overstating the number of times he cut the grass each month. The government consumed many days of trial with painstaking testimony focused solely on the the wire fraud counts in the Superseding Indictment (Counts 14–24). *See* Days 6–9 am and pm Trs. Mr. Busby was not charged in any wire fraud counts, and the Superseding Indictment contained no allegations tying Mr. Busby to any alleged fraud. Nonetheless, a large part of Mr. Busby's joint trial consisted of inflammatory and prejudicial evidence about the alleged fraud Mr. Hutchison committed by overcharging HISD.

What is more, even though Mr. Busby was not charged with wire fraud, the government sought throughout the trial to connect Mr. Busby to the evidence of fraud introduced against Mr. Hutchison. The government went so far as to point out the stamped signature of Mr. Busby on invoices even though there was no evidence that Mr. Busby even saw, much less approved, those invoices. Day 9 pm Tr. at 79:2–81:24. And certainly, there was no evidence the Mr. Busby was responsible for confirming the invoices were accurate or had any knowledge of the number of times the grass was cut each month.

Finally, in closing argument, the government explicitly argued that Mr. Busby was guilty of fraud even though the Superseding Indictment contained no factual allegations that tied him to any alleged fraud, and the government presented no evidence that Mr. Busby engaged in or even knew about any alleged fraud. In closing argument, the government stated:

> And why we're here is because the defendants, **Brian Busby** and Anthony Hutchison, **bilked**[12] **the taxpayers of HISD millions of dollars** in order to get rich.

Day 19 pm Tr. at 3:22–25 (emphasis added). The Superseding Indictment contained no allegations whatsoever that Mr. Busby defrauded, or "bilked," HISD. Yet the government tied Mr. Hutchinson's purported "bilking" directly to the wire fraud counts that Mr. Busby was not charged in.

> [Mr. Hutchison] was **fraudulently bilking HISD of millions of dollars** for years. You saw -- I mean, I know when you think of mowing, you say, ah, you know, that can't amount to much. You saw the numbers on those proposals, ladies and gentlemen. You saw the numbers on those invoices. This was millions of dollars.

*Id.* at 12:22–13:2 (emphasis added). The government's inaccurate and misleading statements resulted in significant prejudice to Mr. Busby.

The government's introduction of a substantial amount of inflammatory evidence to prove the wire fraud counts against Mr. Hutchison along with the government's pointed questioning trying to tie that evidence to Mr. Busby substantially prejudiced Mr. Busby. That evidence would not have been introduced in a trial of Mr. Busby alone because it did not relate to any charges or allegations against Mr. Busby. Thus, the most inflammatory and prejudicial evidence in the trial was admitted to prove the fraud counts against Mr. Hutchison but would not have been admissible in a trial of Mr. Busby alone. Thus, the joint trial of Mr. Busby with Mr. Hutchison resulted in clear prejudice to Mr. Busby.

---

[12]"Bilk" means "[t]o defraud, cheat, or swindle." The American Heritage Dictionary of the English Language, *available at* https://ahdictionary.com/word/search.html?q=bilk *last accessed* Sept. 5, 2025.

### 3. The strip club evidence was highly inflammatory and completely irrelevant.

The government gratuitously elicited testimony that Mr. Hutchison and Mr. Busby went to strip clubs. Such evidence is highly prejudicial and served no legitimate evidentiary purpose. Thus, the only apparent purpose of eliciting that testimony as to Mr. Busby was to inflame the jury and encourage them to convict Mr. Busby based on that conduct rather than the charged conduct.

The government elicited that Mr. Hutchison and Mr. Busby went to strip clubs with its very first witness, Mr. Sanders. Day 2 pm Tr. at 27:13–16 ("We would visit various adult entertainment industry places, strip clubs.").

It was no accident that this testimony was presented to the jury. The government pointedly asked Ms. Skillern-Jones a direct follow-up question so that she would testify that Mr. Busby was at a strip club even though that was completely irrelevant. Day 5 pm Tr. at 22:16–23:2 ("Q: And what is Onyx? A: It's a strip club. Q: All right. And were you there with Mr. Busby? A: Yes."). The fact that the club where they met was a *strip* club had nothing to do with any of the charges in the Superseding Indictment and had no probative value whatsoever. This testimony served only to inflame the jury against Mr. Busby.

Despite having absolutely no probative value, questions regarding strip club attendance permeated the trial. Mr. Hutchison's counsel asked Mr. Skillern-Jones multiple times on cross-examination about Mr. Busby and strip clubs. He even stated in one of his questions that Ms. Skillern-Jones "left the strip club with Mr. Busby." *Id.* at 120:11–120:25, 123:8–24, 137:7–137:21; 140:20–141:5. 141:19–141:24, 148:20–149:12, 150:4–7.

Mr. Hutchison's security guard, Khadeem Francis, had nothing to do with Mr. Busby, but he also testified that he worked at a strip club and met Mr. Hutchison there. Day 17 am Tr. at

20:23–21:3. Despite its inflammatory nature and complete irrelevance, the government asked Mr. Khadeem again about the strip club on cross-examination. *Id.* at 27:16–28:9.

None of this inflammatory testimony about strip clubs had anything to do with the allegations in the Superseding Indictment. Mr. Busby's attorney did not present exhibits or elicit testimony about strip clubs. Rather, the government and Mr. Hutchison's attorney repeatedly asked multiple witnesses about strip club attendance. Further enhancing the prejudice of this evidence, Mr. Hutchison's attorney even cross-examined Mr. Busby about going to strip clubs even though Mr. Busby did not mention strip clubs in his direct testimony. *Id.* at 97:15–98:8. This evidence was highly inflammatory and irrelevant.

### 4. Mr. Hutchison introduced other inflammatory and irrelevant evidence into the trial of Mr. Busby.

Further exacerbating the prejudice of the joint trial, Mr. Hutchison's counsel cross-examined Mr. Busby about an irrelevant text message in which Mr. Busby had used a highly inflammatory racial slur. Neither the government nor Mr. Busby introduced this evidence. Mr. Hutchison did. And it was only presented to the jury in Mr. Busby's trial because Mr. Busby was forced to go to trial with Mr. Hutchison. Day 15 pm Tr. at ("A: I just don't like the – 'N word' – coming nowhere with expectations on me or you. . . . Yea. I have to ask forgiveness for that. I have to ask the jury for forgiveness for that.")

There was no evidentiary value to any of this inflammatory evidence. This evidence was inflammatory, prejudicial, and irrelevant, and it was only introduced at the trial of Mr. Busby because Mr. Busby was jointly tried with Mr. Hutchison.

## CONCLUSION

Mr. Busby's convictions are based on a litany of errors, each of which is independently sufficient to warrant acquittal or a new trial. The cumulative effect of these errors, however,

renders the need for acquittal or a new trial inescapable. Mr. Busby, therefore, requests that the

Court vacate his convictions and enter an order of acquittal or grant him a new trial.

Respectfully submitted,

**JACKSON WALKER LLP**

*/s/ Laura M. Kidd Cordova*
Laura M. Kidd Cordova
State Bar No. 24128031
lcordova@jw.com
Michael J. Murtha
State Bar No. 24116801
mmurtha@jw.com

1401 McKinney St, Suite 1900
Houston, Texas 77010
 (713) 752-4449
 (713) 752-4221 (Facsimile)

***Attorneys for Brian Busby***

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with counsel for the government, and the government is opposed to this Motion.

*/s/ Laura M. Kidd Cordova*
Laura M. Kidd Cordova


## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, a true and correct copy of the foregoing was served electronically on all persons via the Court's CM/ECF system.

*/s/ Laura M. Kidd Cordova*
Laura M. Kidd Cordova